EVANS et al. v. Boggs et al.—245 S. W. (2d) 641.

Western Division at Jackson. August 8, 1951.

On Petition to Rehear September 12, 1951.

Petition for Certiorari denied by Supreme Court, December 12, 1951.

Clarke, Norris & Matherne, of Brownsville, for appellants.

A. M. Carlton and Bond & Haywood, all of Brownsville, for appellees.

SWEPSTON, J. Both parties have appealed from the decree of the Chancellor.

The defendant, Mrs. Boggs, appeals from the action of the Chancellor in ordering a reference for an accounting and from an adverse decree holding her indebted to complainants.

Complainants appeal from the failure of the Chancellor to allow interest on the recovery and failure to render judgment in favor of complainant receiver for the full

amount due the partnership hereinafter referred to and failure to decree payment out of said fund of the expenses of the litigation.

Defendant's appeal will be considered first.

The original bill was filed by and in the name of J. F. Evans and Edgar C. Evans against Mrs. Laura Boggs, Rufus Grantham and H. B. Compton individually and as executors of W. L. Compton, deceased. It is alleged and admitted in the answers that several years ago, the proof showing about the year 1933, an oral equal partnership composed of the complainants, the defendants Grantham and H. B. Compton, and W. L. Compton was formed for the ownership and operation of a cotton gin about 8 miles from Brownsville, Tennessee, under the name of Compton-Evans Gin Company.

It appears without dispute that W. L. Compton acted as manager of the operation and upkeep of the gin plant until his death May 23, 1947; that he and H. B. Compton were brothers, Mrs. Boggs is a daughter, and Grantham is a son-in-law of H. B. Compton; further that one of complainants is married to a cousin of Mrs. Boggs; obviously a family business.

It is alleged that Mrs. Boggs was employed to assist in the operation of the business and to keep the books and records thereof and that she had sole supervision of the books, cash and bank accounts, but the sole supervision is denied by Mrs. Boggs.

It is further alleged that W. L. Compton devised to her his fifth interest in the gin property and partnership; that thereafter Mrs. Boggs entered into and continued to be a member of the firm and they began to plan for the next season of 1947-8; that thereafter at the request of complainants Mrs. Boggs rendered them a statement of the operation of the business for the two seasons,

1945-6 and 1946-7, which showed a loss for the former and a very small profit for the latter season and was so incomplete as to be unintelligible, but they accepted the check tendered in payment of what she showed to be due them; that subsequently it came to their attention that said statement was false in several material particulars set out in the bill; that complainants had the books for the 1946-7 season and when they requested the 1945-6 records, she refused to turn them over; that on account of the dissention which arose complainants decided to withdraw from the firm and their two fifths interest was purchased on September 3, 1947 by Mrs. Boggs and others; that having confidence in her at the time of the statement they accepted the check in settlement, but they now charge her with fraudulently withholding large sums and wrongfully refusing to turn over the remaining records to them.

They pray for the appointment of a receiver to wind up the business of the partnership and for an accounting with Mrs. Boggs as a member of the firm, etc. for the two seasons only.

Mrs. Boggs answered denying that she had ever been a partner or that she was ever in sole charge of the records and finances of the firm, but alleged that she was only a part time employee assisting the partners in keeping their records, paying bills and making gin and seed tickets; she alleged that the firm used her store, which was nearby the gin, as the gin office; that all partners assisted in running the business, handling the cash and writing checks etc., and frequently inspected the records such as they were, and were familiar with the condition of the business; alleged that she requested them to provide her with an adequate set of books but they refused; that they kept no expense account book but in-

structed her to put paid bills on a wire file and that same have been lost or mislaid.

She denied that she ever undertook to furnish complainants with a financial statement, but she merely assisted them in getting up the settlements for the 1945-6 and 1946-7 seasons and the checks issued by her at the end of the latter season were given under the instructions of all the partners and that they all agreed to the settlement as made; that said settlement was made according to the established custom of fixing the net profits by taking the amount of cash on hand at the end of the ginning season after payment of all bills, without a proper checking of the incomplete books and records. She denies that she has made any misrepresentations to complainants and she alleges that she believes said statement for said two seasons to be correct. She denies she is indebted to complainants in any amount or that they are entitled to a receiver or that there are any assets of the firm remaining.

The other defendants filed a joint answer which need not be stated in detail but which was in accord with the answer of Mrs. Boggs.

Upon the filing of the bill the Chancellor appointed the Clerk and Master receiver of the books and records only, but not of the partnership assets.

Upon the issues made by the bill and answer much proof was taken on depositions by complainants, which tended to show that the business for the 1945-6 season had made just about the usual amount of profit as in prior years, instead of no profit as shown on the statement furnished by Mrs. Boggs, and for the season of 1946-7 an unusually large profit, instead of the usual profit, and certain other apparent discrepancies.

Whereupon complainants were allowed to and did file an amended and supplemental bill in the alternative for the purpose of holding Mrs. Boggs to account, either as a partner or as an employee, for the funds they alleged she had wrongfully abstracted and fraudulently appropriated to her own use, and again praying for the appointment of a receiver to be made a co-complainant in order that any recovery to be had against Mrs. Boggs as an employee might be had in the name of the receiver for the benefit of all the members of the firm whether appearing as complainants or defendants in the suit.

Defendants demurred to same upon numerous grounds not necessary to be here stated, the same was overruled and they were allowed to rely on same with their answer, which was duly filed denying the material allegations of the amended and supplemental bill.

Mrs. Boggs was allowed to amend her answer so as to plead an account stated and settled and that the allegations of the amended and supplemental bill were too indefinite to entitle complainants to surcharge and falsify said account. Complainants moved to strike this amendment because same was inconsistent with and contradictory of her original answer that she had not furnished complainants a financial statement, which motion was overruled.

. Complainants were then allowed to amend the prayer of the bill so as to pray that the written settlement sheet relied on by Mrs. Boggs be set aside and held for naught, for a general accounting and to pray for interest on any funds she might owe the partnership; also, if the Court should hold it to be an account stated, to amend the bill so as to permit surcharging and falsifying said written statement in further detail.

Defendants' demurrer to same was overruled.

The cause was then referred to the Master to take and state the account (1) whether Mrs. Boggs was indebted to the firm from the two seasons, (2) if so, in what amount and (3) the amount due the two complainants by the firm, and directing that the Master consider the proof then on file and such other proof the parties might take.

The Master filed his report in which he found that Mrs. Boggs was in charge of the finances of the firm and was indebted to it in the net amount of $9,059.73 for the two seasons; that the firm was indebted to Edgar Evans in the net amount of $1,988.15 and to J. F. Evans in the sum of $1,916.49, or a total of $3,904.64.

The Court overruled all exceptions of defendants to the Master's report, confirmed the same, appointed J. F. Evans receiver and rendered judgment in his favor for the above amount less 2/5 of $53.06 in the hands of the Clerk which sum had been in the firm's bank account at the commencement of the suit, or the net judgment of $3,883.42.

The record in this case consists of almost 2000 pages.

Defendants have 81 assignments of errors, some of which, however, cover the same principles and counsel have treated many of them in groups. We shall do likewise.

■ Counsel are familiar with the rule that a concurrent finding by the Master and the Chancellor is conclusive on appeal, unless the finding be on an issue not proper to be referred, or is based on an error of law, or upon mixed law and fact, or is not supported by any material evidence. Black v. Love & Amos Coal Co., 30 Tenn. App. 377, 206 S. W. (2d) 432; Code, Section 10620.

A part of Assignment #34 should be considered at the outset.

The pleadings disclose that a basic issue was whether or not Mrs. Boggs was in sole charge of the finances of the firm.

The complaint is that this was a question of law and should not have been referred to the Master and that there is no evidence to support his finding.

It was not expressly referred as the order of reference discloses, but the Master found that she was in sole charge.

■ ■ We think it a pure question of fact, being one of the controlling issues of fact and that it should have been determined by the Chancellor before the reference; hence the concurrent finding by the Master and the Chancellor is not binding on appeal. We find, however, that there is ample evidence to support the finding and same does not preponderate against his finding. She handled all of the transactions with the six oil mills to which she sold the cotton seed, she handled all of the banking with the two Brownsville banks and she handled all other matters except six or eight checks drawn for her by some of the partners; the testimony of her father, H. B. Compton, who died pendente lite, supports this finding; she testified she ran the business the best she could.

This assignment is in this regard overruled.

The other part of same complains that most of the evidence is incompetent and no case had been made against defendant to justify a reference.

Our views in this regard follow—hereinafter under assignments relating to the admissibility of the evidence and under Nos. 32 and 33.

Before discussing other assignments we find from the record the following:

From the inception of the firm about 1933 Mrs. Boggs' store nearby the gin was used as the gin office and she was employed to keep the records and handle the finances and to figure and pay the rebate tickets. It was known by all the partners that she was not a trained bookkeeper, but she was of better than high school education and was running her own store. She was not supposed to keep a regular set of books. The system intended to be used was that she would keep the gin book and a record of the seed purchased and sold; that all revenue would be deposited in the bank and all disbursements would be paid by check, so that at the end of each season, they could take the bank balance on hand, after payment of all bills, as the net profit for distribution.

It was known, however, that a customer who sold his seed to the gin, as most of them did after saving seed from the first bale for planting next year, would want cash, because there were no other places nearby where he could get a check cashed. It was therefore necessary to make provision for same; besides it would draw trade to her store. This made it necessary for Mrs. Boggs to have cash available, so the system intended was for her to figure the "rebate" when the customer brought his gin ticket to the store, write a check payable to him, have him endorse it, pay the check and keep the check as a record.

Then when all cash on hand had been used on seed purchases or other disbursements, the equivalent checks could be taken to the bank, cashed and the revolving fund renewed or restored; when the checks were later obtained from the bank after the bank book was balanced, there would be a detailed record of all disbursements, even though not entered in a firm ledger.

The members of the firm thought that this system of handling cash was being followed. See especially testimony of Mrs. Boggs' father, and of Edgar Evans.

It appears, however, that Mrs. Boggs at some point before the two seasons in question, ceased to abide by this system and unknown to her employers she failed to deposit all receipts in the bank, disbursed items of cash without keeping a record of expense items, overdrew her salary and otherwise created a condition whereby the firm had no records or system through which its financial condition could be determined except by reference to outside sources, as was done by complainants for the purposes of this suit.

Under this misapprehension and on the trust reposed in Mrs. Boggs by her family, the partners accepted without question the dividends she distributed each year, or as in the 1945-6 season her oral statement that there was a loss on the season's operation.

Such were the circumstances under which in June 1947 Mrs. Boggs prepared a brief summary of the total receipts and disbursements for the last two seasons, showing a loss for the former and a net dividend for the latter of only $50.21 to each, which she did not pay in that form, but instructed each of them to deposit in the firm bank account his check for $270.66 to cover bills payable shown as $1353.32, with the further instructions that when same had been done the check issued by her to each in the amount of $320.87 would be good.

The complainants complied without any question, although some of the other members have not yet paid the specified sum into the treasury.

W. L. Compton died in May 1947 leaving his interest in the gin to his niece, Mrs. Boggs. For a short time it seemed that the firm would continue, with her taking

the place of her deceased uncle as a partner, but by reason of some discord, it was decided to sell the gin at public auction which was done on September 3, 1947 and the purchasers, Mrs. Boggs and others, became the Lebanon Gin Company and the complainants dropped out and received their pro rata of the sale proceeds.

Complainants, however, before the sale had obtained from Mrs. Boggs the 1946-7 gin books in order to find out the names of customers and the volume of business with a view towards estimating how much they would be willing to bid for the gin at public sale to be held. They were not willing to go over $10,000.00 and so the gin went to the other group at about two thousand more. Shortly after the sale, complainants' suspicion was aroused by the usual neighborhood process of attending to the other fellow's business; different ones wondering and asking why the Evans brothers let the gin go after such a profitable season most operators had enjoyed in 1946-7.

Complainants then began their investigation at the oil mills, banks etc., which developed many ostensible discrepancies.. They called on Mrs. Boggs for the 1945-6 books, she refused to turn them over, and this suit resulted.

The proof is quite overwhelming that when she made these representations at the end of the 1945-6 season that there was no profit and at the end of the 1946-7 season that the net profit was only $50.32 each, she was speaking either with knowledge of their falsity, or with disregard of their truth or falsity; either would be fraudulent, because she intended the parties to rely on the verity of her statements and they did rely on same.

Complainants have set up the partnership account with Mrs. Boggs by means of the following evidence:

The testimony of persons in charge of the books at the respective oil mills with copies of the accounts of business transacted by each mill with the partnership and other documentary evidence;

The testimony of the two Brownsville Banks with documents;

The testimony of the two complainants Evans and of their auditor, Crandell.

Assignments 1-16 deal with objections made to evidence given by the oil mill witnesses.

Defendants' objections are:

(1) the records were not properly proved, nor shown to be correct. The failure to introduce the person who made the records is not explained;

(2) only copies of the books and other records were filed. The originals were the best evidence but were not filed;

(3) defendant was deprived of an opportunity to cross-examine the witnesses as to the originals;

(4) the pleadings did not justify the introduction of such evidence. (This last will be treated under Assignments #32 and 33).

We think there is no merit in (2) and (3).

The books and records were the property of the firms not parties to the suit and they have no interest in the suit.

Counsel for complainant proved by the representative of each firm that it was not willing to file the originals. The copies filed were compared with the originals and were proved to be correct copies and the original supporting data was read into the record.

It was expressly held in Hauenstein v. Gillespie, 73 Miss. 742, 19 So. 673, 55 Am. St. Rep. 569, that it was proper to use copies of private records, where the origi-

nals belonged to witnesses not interested in the litigation.

The same procedure was followed in Burns v. City of Nashville, 142 Tenn. 541, 605, 221 S. W. 828, where the books and records were the public records of the City and in State ex rel. Stewart v. Follis, 140 Tenn. 513, 521, 205 S. W. 444, where they were the tax records of the County and State.

In these cases copies were held admissible on the further ground that the records were so voluminous as to make it impractical to introduce the originals.

█ It is further held to be competent to introduce audits or summaries of the contents of voluminous and complicated records prepared by competent persons, because the court or jury would not have the time nor the ability to interpret the originals.

In all such cases the originals must be available for examination by both parties.

█ In this case the records were available, because the depositions were taken in the oil mill offices with the books and records present.

As to cross-examination of the originals, this objection is based on the voluminousness of the books and records of these large oil mills and the time necessary to examine them, coupled with the fact that the Chancellor ordered the Master to report within 60 days.

█ However it was proved that each mill was willing to permit either party to examine their books and records. Counsel should have proceeded to have them examined and if necessary, a request should have been made of the Court for additional time.

As to (1) supra, it embodies two objections, (a) that the person who made the entries did not testify, nor was his absence accounted for, (b) that the person in

charge of the books did not testify to the correctness of same.

These are separate questions arising out of separate and different facts. (a) relates to the situation in the Independent Oil Mill books; there neither the bookkeeper nor the office manager in general charge of all records was employed in such capacity until November 1947, which was after the transactions; hence they could not and did not testify to the correctness of the records; those in such positions at the time of the transactions were not called, nor was their absence accounted for; this latter was necessary in order to make the evidence admissible even though they were shown to be entries in the regular course of business. Wigmore, 2d Ed. Sec. 1521;

■ If, however it is meant to be contended under (a) supra, that every clerk or other person who furnished the data from which the ledger was derived should have testified, unless shown to be not available, such is not the modern rule and the contrary appears in Edgewood Lumber Co. v. Hull, 32 Tenn. App. 577, 223 S. W. (2d) 210, 17 A. L. R. (2d) 228, citing Wigmore and other authorities, and it was Held, that the person making the first permanent entry, such as in the ledger, from the data furnished by the several persons composing the chain of steps culminating in the completed sale or other transaction could vouch for the correctness of the final entry, without the necessity of calling all these persons or accounting for their absence.

This arises out of the demands of practical business necessity.

■ For the same reasons, where the entries are made in the regular course of business by one or more book-keepers, but under the general supervision of a head

bookkeeper or cashier or office manager, it is not necessary to call the one who actually made the ledger entry, because the same may be vouched for by the over-all head under whose supervision the records are made and who testifies from personal knowledge. Continental Nat. Bank v. First Nat. Bank, 108 Tenn. 374, 380-381, 68 S. W. 497; 20 Am. Jur. 921, Sec. 1069.

As to (b) supra, counsel for complainant introduced copies of the account books and proved they were correct *copies,* but in most instances failed to prove the correctness of the originals, although the witnesses were familiar with the books and records and testified as to their having been kept in the regular course of business.

 We think that where a witness is available who has personal knowledge of the correctness, he must testify to same even though they are entries in the regular course. If no witness is available who has personal knowledge of correctness, then upon accounting for the unavailability of such person, proof of the records having been kept in the regular course makes them admissible. Wigmore, 3d Ed., Secs. 1521, 1554; 20 Am. Jur. 1043 and note 6 citing Chaffee & Co. v. United States, 18 Wall. 516, 21 L. Ed. 908.

 We are of opinion, therefore, that in so far as the points under discussion are considered alone, the books were not admissible, but the discussion need not be prolonged, because they were admissible on other grounds.

 Mrs. Boggs as agent for the partnership has accepted the accounts of all the mills as being correct; she had certain corrections made in some of them; she had borrowed money for her personal use and the mills had erroneously charged the items to her employer; with these few exceptions, she has received statements from

them and has settled the accounts for her employer by paying its money to the mills. The documentary evidence of same and her conduct in that regard is fully shown in evidence and it amounts both to an admission that the accounts are correct and to an estoppel to deny same.

██ "For the foregoing reasons it is immaterial, when an opponent's statement is offered as an admission, that it was *uttered to a third person* and not to the other party to the cause. Evidentially it is still an inconsistent statement and therefore receivable. If on the other hand it were put forward as the basis of an estoppel right, because acted upon by the other party to the cause, there would be ground for holding that it must have been made to him directly or else he would not have been justified in relying on it; and such would be the usual requirement, for purposes of estoppel". Vol. IV, 3d ed., Wigmore, Sec. 1057 a.

If it be an admission only, it is not conclusive, and may be rebutted; if an estoppel it is conclusive on her and may not be rebutted. Ditto, Sec. 1059. See also 20 Am. Jur. Sec. 1084; 53 L. R. A. page 528.

Mrs. Boggs' actions were not only an admission to a third party but were a representation or statement necessarily to her employer that the oil mill accounts were correct; it has through her been caused to accept those accounts as being correct and settlements have been made and paid on that assumption.

We think she has not only admitted their correctness but is also estopped to claim otherwise.

Hence, reserving the question of the sufficiency of the pleadings, we overrule assignments 1-16.

Assignments 17 & 18 make the same objections as un-

der 1-16 to the testimony of the officials of the two Brownsville banks.

They are overruled on the same ground, estoppel.

In connection with all 18 assignments it appears that Mrs. Boggs has not questioned a single item of either the mill or the bank records other than the few items above stated; further that she employed an auditor who did make some sort of examination of the gin records and who had permission to examine the oil mill's records, but for whatever reason he did not appear as a witness in the case.

Assignment 19 objects to the testimony of E. C. Evans wherein he states the reason why he and his brother made an investigation of the firm affairs and employed the auditor, Mr. Crandell on the ground that same was self serving.

Assignments 20 and 21 object to the testimony of E. C. Evans as to what he found on investigation of the records of the mills on the ground that same is hearsay and opinion evidence about which the witness not being a bookkeeper is not qualified to speak.

We think the evidence was competent, because Mrs. Boggs in her answer questioned the motives of complainants in filing the suit by charging among other things that they were actuated by disappointment in not being the successful bidders at the public sale of the gin. Overruled.

Assignments 22 and 23 object on the same ground to E. C. Evans exhibits 9 and 10, which are the expense accounts for the two seasons and about which he testified as to each item.

Since every item is supported by cancelled checks, receipts etc., handled by Mrs. Boggs, except a few of

which the witness had personal knowledge, these assignments must be overruled.

■ Assignment 24 refers to some of the testimony of J. F. Evans. In part he testified that he had examined the checks filed with the Clerk and Master and that all were drawn by Mrs. Boggs except two or three by his brother Edgar. This was not objectionable. Part relates to conversation had with Mrs. Boggs' husband, but she was present; hence it is not objectionable. Part relates to conversations with his brother and H. B. Compton when Mrs. Boggs was not present. It was not admissible, but is harmless error. Overruled.

Assignments 25-29 relating to the testimony of J. F. Evans are the same as those relating to Edgar Evans and are for the same reasons overruled.

■ Assignments 30 and 31 relate to the testimony of W. W. Crandell who made the audit for complainants. The first ground stated is that C. B. Larde assisted Crandell in making the audit but did not testify as to part he made and that under State ex rel. Stewart v. Follis, 140 Tenn. 513, 205 S. W. 444, where one of several auditors fails to testify as to his part, none of the entire audit is admissible. The record does not support this ground. To the contrary Crandell testified that he himself made the audit and the only thing Larde did was to assist him in compiling the report, a mere clerical task done under Crandell's supervision and checked by him.

A further ground is one gin book was never found which contained the record of the first 185 bales ginned in the 1945-6 season. It so happened, however, that 58 of those were ginned for the complainants from time to time, spotted throughout the period the 185 were ginned. Complainants had the record of their bales and by using them as a basis an estimate was made on the other 127

by taking the average weight of seed and average charge for ginning multiplied by 127.

We realize the result is not exact but we think the approximation is close and that it is not objectionable.

A further ground is that Crandell made an audit of the evidence, pleadings and records on file and undertook to explain what they showed and that his report is hearsay and opinion that he is not an expert.

We think the record shows Crandell was a competent bookkeeper and capable of making an audit and that the fact he is not a "certified public accountant" goes only to the weight and not to competency; that since he took his figures from the records of the oil mills and banks, which we have held were properly admitted in evidence, and from documentary evidence of the partnership and from some information obtained from complainants who testified in the case, and from certain admissions in the answer, the compilation of figures composing the audit is not subject to such objection.

These assignments are overruled.

Assignments 32 and 33 complain of the action of the Chancellor in allowing complainants to amend their original and supplemental bill for the purpose of surcharging and falsifying the account; for the reasons (1) it came too late, because all proof had been taken, (2) the matters therein were known to complainants when its other pleadings were filed, and (3) the allegations are too general and indefinite for surcharging and falsifying a settled account.

We are sure that able counsel knows that the allowance of amendments is within the sound discretion of the Chancellor and his action will not be disturbed unless it is shown on appeal there was a clear abuse of same. Phoenix Ins. Co. v. Jordan, 28 Tenn. App. 11, 184

S. W. (2d) 721. Has the appellant shown an abuse of discretion?

We think not for the following reasons. The original bill was filed December 1, 1947 under the circumstances related supra. The answer was filed January 14, 1948, the substance of which appears supra. The supplemental bill was filed June 23, 1948, for reasons stated supra; this was a few days after completion of complainants' proof in chief. Defendant answered June 28, 1948. Defendant then took proof and on April 26, 1949, was allowed to amend her answer to charge that complainants' suit was an effort to surcharge and falsify a settled account on allegations that were too general and indefinite. All proof was completed May 18, 1949. It was in response to the defendants' amended answer that complainant on October 25, 1949 moved to strike same, as being inconsistent with and repugnant to the allegations of the answer to the original bill in which answer it was stated that the statement rendered by Mrs. Boggs, exhibit 1 to original bill, was not an account, but merely an estimate; upon this motion being overruled, complainant filed the amendment now complained of in which he sought to amend the prayer so as to pray that said purported settlement be set aside and defendant be charged with interest on sums-withheld from the firm, and in the alternative, in the event the court should hold it to be a stated or settled account, by charging said statement to be a false representation and specifying several details in which it is false; further by amending the prayer so as to pray that said account be opened and a general account be taken for the two seasons and complainant be permitted to surcharge and falsify same.

All of this was done on October 25, 1949, when the

court was in session and just before the order of reference was made.

As to (1) supra, we do not think the Chancellor abused his discretion in allowing the amendment. This is not a run-of-the-mine suit and each party appears to have been feeling his way as if wading upstream in a mountain creek, complainant not knowing what was ahead and defendant not being sure of what was past and ended. In truth the pleadings seem to have been filed with more celerity than usual in a suit of this complicated nature.

As to (2) supra, we do not think it can be fairly said that complainant knew that defendant was going to plead a stated and settled account until her amendment of April 26, 1949, because up to that point she had alleged that the profits had only been estimated and that the estimate was made by all the partners and that she had merely composed the statement and written the checks under their direction; she was overwhelmingly contradicted by the proof as to this claim, including the testimony of her father.

As to (3) supra, considerable space is devoted in the briefs to a discussion of whether this was a stated and settled account.

There may be room for doubt under some decisions whether it was a stated account, because the items composing the account were not examined and a balance struck. See Bussey v. Gant's Administrator, 29 Tenn. 238; 1 Am. Jur. 272, Sec. 16.

There is no doubt, however, it was a settled account to all intents, until complainant later investigated the oil mill records.

Even if it be a stated and settled account complainant would not necessarily be confined to a bill to surcharge and falsify it. The relief to be allowed depends

on the situation involved. Gibson's Suits in Chancery, Sec. 955, after fully discussing the subject says: "In general, where fraud, imposition, undue advantage, or fiduciary relations are shown to exist, the Court will incline to open up the whole settlement; in cases of accident, mistake, omission or inaccuracy, the Court will ordinarily allow the account to stand, with liberty to the complainant to surcharge and falsify; or in a weak case, the Court may open the account only as to the matters specially set out by complainant in his bill". Patton v. Cone, 69 Tenn. 14, relied on by defendant is cited by Gibson for these principles, but on the facts it was simply a bill to surcharge and falsify certain items on the ground of mistake; there were no fiduciary relations, both parties being merchants and dealing as strangers or at arm's length.

The same principles are stated in Bankhead v. Alloway, 46 Tenn. 56, 75, where, however, no fraud was alleged but only mutual mistake and that as to one item only.

State ex rel. Stewart v. Pollis, 140 Tenn. 513, 205 S. W. 444, was a case where the State sought by a very general bill years after he went out of office to hold a county trustee for the net amount claimed to be due for each year from his tenure of two years; although the public records showed the trustee had made monthly settlements which had been approved as required by law, the bill made no mention of such settlements, made no attack on them, filed no itemization of the totals claimed for each year and on this the complainant proceeded to prove by an accountant a report purporting to show the items making up the totals sued for. The bill was dismissed on appeal without prejudice in order that a proper bill might be filed to serve as a basis for surcharging and falsifying the accounts.

In the instant case the bill alleged a fiduciary relation, charged fraud and, we think, charged it as definitely as could have been done in view of the way the business was supposed to have been conducted. We think the Chancellor did not abuse his discretion in allowing a general accounting.

Hence we overrule these assignments.

For the reasons heretofore stated under assignments directed at the evidence and the pleadings we overruled the remainder of Assignment #34.

Assignments 35 to 78 are based on exceptions to the report of the Master.

Assignments 35, 36, 38-40, 49, 67-69, are based on alleged inadmissibility of evidence, which we have under earlier assignments held competent and same are overruled.

No. 37 has already been discussed under No. 34 and overruled.

No. 41 states there is no evidence to support a finding of $337.95 in 1945-46 on hulls and meal.

This item is supported by letter of Mrs. Boggs and Crandell's audit, ex. 1 and 3 to Crandell. Overruled.

Nos. 42-47, 49-66, 71-76 and 78 all go to the weight of the evidence, which we cannot consider and are overruled.

No. 48 complains of the action of the Master in reporting under the third question in the order of reference that Mrs. Boggs was indebted to the partnership in any amount; it is said the firm is not suing her and the suit is by the two Evans brothers and that the proof does not support the finding.

No. 79 seems to be related to No. 48 in that it is said the Chancellor should not have appointed a receiver in whose favor the final money decree was rendered.

As heretofore shown in the recital of the pleadings, the original bill alleged Mrs. Boggs was a member of the firm and should be made to account as a partner to the others. Such a suit may be maintained in equity by any one or more partners.

When, however, she answered denying she was a partner but was only an employee, the supplemental bill was filed and the court was asked to appoint a receiver and make him the party complainant, because less than all the partners cannot sue on an obligation due the firm. Coffee v. Eastland, 3 Tenn. 159; Harris v. Columbia Water & Light Co., 108 Tenn. 245, 67 S. W. 811; 68 C. J. S., Partnership, Section 208 (a), page 680.

When the Chancellor saw that the evidence showed Mrs. Boggs was only an employee, he appointed J. F. Evans the receiver in order that the decree could be properly rendered in favor of the receiver.

There was no error in appointing a receiver, because otherwise there would have been a defect of parties.

"If all the parties who should be before the Court, are not made parties, upon the question being raised by demurrer, plea or answer, the Court will allow the bill to be amended; * * *". Gibson's suits in Chancery Sec. 111.

The offer of Mrs. Boggs to pay any judgment that might be rendered in favor of the Evans brothers did not obviate the necessity of appointing a receiver, because jurisdiction can not be conferred by consent. Board of Directors of St. Francis Levee Dist. v. Botkin, 108 Tenn. 700, 69 S. W. 270.

We have already held that there was evidence to support the findings.

These are overruled.

No. 70 is controlled by what is ruled under Nos. 32 and 33 and is overruled.

No. 77 is that Mrs. Boggs is being held liable as an insurer of the firm's property and income regardless of whether or not there were any profits.

We do not think so. Of course the gist of this suit is fraud in misrepresenting the facts about profits. But in any case whether fraud is involved or not an agent who has disobeyed instructions of his principal is liable for the loss occasioned thereby.

"Whenever an agent violates his duties or obligations to his principal, whether it be by exceeding his authority or by positive misconduct, or by mere negligence or omission in the proper functions of his agency, or in any other manner, and any loss or damage thereby falls on his principal, he is responsible therefor and must make full indemnity". (Quoted from Story on Agency). Kirkeys & Son v. Crandell, 90 Tenn. 532, 18 S. W. 246.

An agent, though not an insurer is liable for failure to use ordinary care, skill and diligence 3 C. J. S., Agency, Sections 147, 155.

An agent is bound to keep correct and intelligible records and to report when called upon, unless such duty is excused by the particular character of the agency, or rendered unnecessary or impractical by the conduct of the principal.

In the case at bar Mrs. Boggs has disobeyed instructions in not abiding by the method prescribed for handling the finances. In lieu of that method she has failed to keep records from which she could account. The principal has from other competent sources assembled an account against her showing a substantial profit contrary to her representations and she has not succeeded in refuting the account. Although she testified she had

some important items of firm business on her individual ledger, she failed to produce the record when called on.

These assignments are overruled.

Nos. 80 and 81 are general and the argument thereunder covers matters already dealt with; hence these and all other assignments are overruled.

Referring now to complainants' appeal, the first error assigned is that interest was allowed from the date of the filing of the bill, whereas it is said interest should have been allowed on the 1945-6 profits from the close of the season early in the year 1946 and likewise as to the profits of the 1946-7 season.

Ordinarily the rule on unliquidated demands, for which interest has not been contracted and hence not falling under Code Section 7305, the allowance of interest is discretionary with the Chancellor.

But where a judgment stems from fraud, interest will be allowed at 6% from the accrual of the cause of action unless the judgment debtor show matters in mitigation of damages including interest. Dale v. Thomas H. Temple Co., 186 Tenn. 69, 208 S. W. (2d) 344, 354.

Complainants' cause of action in the instant case accrued upon discovery of the fraud, because of the concealment by defendant; and not from the commission of the fraud. Vance v. Mottley, 92 Tenn. 310, 21 S. W. 593; Boro v. Hidell, 122 Tenn. 80, 120 S. W. 961; Herndon v. Lewis, Tenn. Ch. App., 36 S. W. 953; Bodne v. Austin, 156 Tenn. 353, 2 S. W. (2d) 100, 62 A. L. R. 1410.

Complainants say in the brief: "* * * This lack of knowledge of the accrual of the cause of action necessarily delayed the filing of the bill until December 1947. Interest, therefore, should be allowed *from the dates the cause of action accrued,* and not from the filing of the bill".

We think the italicized language is a non sequitur to the first sentence and reflects a misapprehension as to when the cause of action accrued.

Obviously from the first sentence and from the entire record, it is to be strongly inferred that complainants could not be said to have fully and actually discovered the fraud until their investigation was complete and the results caused them to be willing to risk the suit.

To such a short lapse of time the rule of de minimis will be applied and the Chancellor will not be held in error.

■■■ Under all authorities the cause of action for fraud accrues at the time of its commission, unless there is concealment by the wrongdoer, in which event it accrues upon discovery of the fraud. Overruled.

The second assignment is that the Chancellor erred in rendering a decree only for an amount sufficient to pay the two complainant partners; that he should have rendered judgment for the full amount in favor of the receiver, out of which the expenses of prosecution of the suit should have been paid, including attorney fee, to complainants by way of reimbursement, and the balance prorated among the partners.

We think there is merit in this view.

These complainants at their own expense prosecuted this suit to recover firm assets, against the wishes of the other partners. The Chancellor should have appointed the receiver when the defense was raised that less than all partners could not maintain the suit, and he afterwards and before final decree did appoint him; otherwise complainants would have been without remedy. See Pomeroy's Equity Jurisprudence, 5th ed., Sec. 1330 et seq.

Even though the firm had been dissolved so far as

concerned known assets, this asset remained undistributed firm property.

■ The Uniform Partnership Act, Code, Section 7857 (b) provides: "The partnership must indemnify every partner in respect of payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business, or for the *preservation* of its business or *property*".

Under the authority of Bird v. Collette, 26 Tenn. App. 181, 168 S. W. (2d) 797, 799, and numerous Tennessee cases cited therein, complainants are clearly entitled to "reasonable costs and expenses of the litigation, including reasonable fees to complainant's counsel".

The assignment is sustained.

■■ A decree will be entered here in favor of the receiver for the full amount due the firm as now shown by this record with 6% interest from the filing of the original bill, December 1, 1947 and all court cost, said judgment to be satisfied as hereinafter provided; the cause is remanded and a reference ordered to fix expenses of litigation including attorney fees incurred by complainants; said fees and expenses will be deducted from the total amount of the judgment and paid to complainants; out of the remainder complainants will be paid their pro rata share; in view of the fact that the other partners have estopped themselves from sharing in said assets, the judgment herein rendered will be satisfied by defendant by payment into court of (1) the expenses and fees incurred by complainants, (2) the pro rata share of the remainder of the judgment due each complainant after adjustment of his account with the firm as was done under Item III of the Master's previous report, R. 156, (3) all costs, (4) and the remainder of said judgment due the other three partners the Clerk will mark the

same satisfied in full, for all of which execution may issue as at law.

ON PETITION FOR CORRECTION OF OPINION.

Counsel for appellees have called our attention to two errors in the opinion filed herein August 8, 1951.

The first is the omission of the word "not" on page 13, twenty-first line [245 S. W. (2d) 651]. The correction will be made by insertion in the original opinion, so as to make it read: "* * *, but for whatever reason he did not appear as a witness in the case."

The second is we inadvertently stated that the Chancellor decreed interest from the filing of the bill, whereas he allowed no interest before the final decree; that since we allowed interest from the filing of the bill, the assignment should have been sustained and not overruled.

Appellees' assignment of error is: "The Chancellor erred in failing to find * * * that interest be allowed * * * from the dates the respective amounts should have been paid by her. * * * The judgment * * * should have borne interest from the date of the accrual of the cause of action."

On page 10 of the brief it is said: "Complainants respectfully submit that the real question here is, not whether interest should be allowed on the recovery, but from what date it should be allowed, whether from the accrual of the cause of action or *from the date the bill was filed.*"

On page 13 it is said: "* * * This lack of knowledge of the accrual of the cause of action necessarily delayed the filing of the bill until December 1947. Interest, therefore, should be allowed from the dates the cause of action accrued, and *not from the date of the filing of the bill.*"

In support of the above assignment it was argued that the cause or causes of action accrued at the end of each of the two ginning seasons and that interest should have been allowed from those dates instead of from the filing of the bill. It was in answer to this contention that we dealt in the original opinion with the question of when the cause of action accrued, pp. 21 and 22 [245 S. W. (2d) 655].

We, therefore, simply assumed that the Chancellor had allowed interest from the filing of the bill. Had we deemed it necessary in the face of the foregoing to refer at the time to the record, we would have discovered the error.

The suggestion of correction is well made and the assignment is sustained, although it effects no change in the net result.

In this connection, however, counsel state that we definitely held in the original opinion that where a judgment stems from fraud, interest will be allowed *from the filing of the bill.*

With deference to counsel we did not intend to so rule. Reference to page 22 of the opinion [245 S. W. (2d) 655] we trust will disclose that we held that where there is active concealment of fraud, the cause of action does not accrue until the discovery of the fraud; that interest will be allowed from the date of discovery; that in this case the discovery of the fraud and the filing of the bill were virtually synchronous, because it is to be strongly inferred from the record that complainants could not fairly be said to have discovered the fraud until they were willing to, and did, risk filing the suit. Hence, it was our intention to bring it squarely within the rule—

interest from the accrual of the cause of action, December 1, 1947.

Baptist, P. J., and Davis, Sp. J., concur.

ON PETITION OF DEFENDANT TO REHEAR.

SWEPSTON, J. The first ground of the petition relates to the matter of interest and has already been called to the Court's attention by petition of complainants for correction of the opinion, which correction has been made with no change in the net result, interest having been allowed by the original opinion from the accrual of the cause of action and no change is made in that regard.

The second ground relates to page 23 of the original opinion [245 S. W. (2d) 656] whereby provision is made for reimbursement of complainants for expenses incurred in prosecuting this suit.

Petitioner complains that Mrs. Boggs is being required to pay same. Reference to the original opinion will disclose that such is not a correct statement. A judgment is rendered against her for the total amount due on the accounting plus interest plus court costs and no more. Under no circumstances would she have had to pay more than that, if we had required the full amount to be paid into court; and if such had been required, the expenses of litigation incurred by complainants would be deducted from the total judgment and interest and paid to them as reimbursement before any pro rata distribution of the net partnership asset because complainants have already paid, or incurred personal and individual liability for, these expenses; not only their part but the shares of the other partners also; it is only after the complainants

have been reimbursed that any assets remain for distribution among the partners.

In view, however, of the position taken in the suit by the other partners to the effect that Mrs. Boggs owed nothing to the firm, they should not now be allowed to participate in the assets at the expense of Mrs. Boggs, and they do not so contend, nor should the complainants have the benefit of the entire net assets at the expense of Mrs. Boggs, and they do not so contend.

But it would seem to be a legal solecism to hold that complainants could be deprived of full reimbursement of expenses by reason of the estoppel of the other partners.

For these reasons we have made the provision as to the way the judgment against Mrs. Boggs is to be satisfied.

All other grounds are reargument of matters disposed of in the original opinion, with one exception. It is said we overlooked the objection to the testimony of the several oil mill officials and employees on the ground they were not experts, as in State ex rel. Stewart v. Follis and Burns v. City of Nashville.

With deference to counsel, we did not overlook the point but did not see fit to discuss it, because obviously there is no merit in it. We think the factual situation, to which the rule was applied, in those cases is quite different from what we have here in the testimony of the oil mill witnesses.

In those cases the witnesses were called on to audit voluminous records and documents and to compile a statement of the net result; that is to compile the account. Of course, this could only be performed by a person accustomed to keeping books.

In the instant suit the oil mill witnesses were not called on to compile a statement of account with anybody, neither Mrs. Boggs nor the partnership; the accounts

with the partnership were already compiled in the form of the ledger entries. Some of the witnesses had either made the entries, or were familiar with them and did therefore testify the books were correct; others had no connection with the books during the period in question and could not testify to their correctness. But every witness called for the purpose could and did identify the books and records as being those of his employer; this did not require skill as a bookkeeper, but merely personal knowledge of the fact; any clerk, stenographer, or lesser employee having personal knowledge of the fact that they were the employer's books and records could identify them as such, although they might have no knowledge of the contents or of the correctness of same. Almost any literate person could make a correct copy of the ledger sheet.

The procedure followed was:

The witness identified the books and supporting records, as being those of his employer but in some instances did not testify to their correctness; exhibited copies of all such and testified they were true copies; this put them in evidence conditioned upon proof being made of their correctness; we held in view of Mrs. Boggs' conduct that not only were these records an admission against interest, but also that she was estopped to question their correctness.

On the other hand, Crandell, who was procured by complainants to do so, was the person who compiled the account between Mrs. Boggs and the partnership from the records of the mills, the banks, the partnership and other sources. His function furnishes the analogy to the function of the witness in the Follis and the Burns cases.

We dealt with the question of his competency on page 15 of the original opinion [245 S. W. (2d) 652].

 We might add that the qualification of a witness as an expert is largely within the discretion of the trial judge and will not be reversed on an appeal unless clearly erroneous or abuse shown. Keys v. Keys, 23 Tenn. App. 188, 129 S. W. (2d) 1103; Foster & Creighton Co. v. Hale, 32 Tenn. App. 208, 222 S. W. (2d) 222, 226.

With due appreciation of the skill and zeal of counsel, we think the petition should be disallowed.

Baptist, P. J., and Davis, Sp. J., concur.