### Beverly MORAN

v.

### Elliot WILLENSKY.

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Dec. 1, 2009 Session.

Feb. 2, 2010.

Application for Permission to Appeal
Denied by Supreme Court
Sept. 1, 2010.

T. Holland McKinnie, Franklin, Tennessee, and Mark M. Mizell, Nashville, Tennessee, for the appellant, Elliot Willensky.

Anne C. Martin and William T. Cheek, III, Nashville, Tennessee, for the appellee, Beverly Moran.

## OPINION

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

This case arises from a partnership gone bad. The trial court found that the Appellant wrongfully dissociated from the partnership. Pursuant to the Tennessee Uniform Partnership Act, Tenn.Code Ann. § 61–1–101 *et seq.*, the trial court awarded Appellee project costs, and winding up costs, including attorney's fees. Appellant appeals. We affirm.

Appellant Elliot Willensky and Appellee Beverly Moran met through their synagogue and became friends. Prior to the transaction that is the subject of this litigation, Ms. Moran had loaned Mr. Willensky money in exchange for a promissory note, which obligation had been satisfied. Ms. Moran is a tax law professor at the Vanderbilt University School of Law; Mr. Willensky had moved to Nashville to be a songwriter. Ms. Moran does not have any professional experience in construction or home rehabilitation, but does have limited experience doing home remodeling on a small scale. According to the record, Mr. Willensky represented to Ms. Moran that he had worked as an independent contractor since 2000, and that he had extensive experience with renovating properties. Specifically, Mr. Willensky told Ms. Moran that he had recently renovated a three-unit apartment building in New Bedford, Massachusetts.

At the time the parties met, Mr. Willensky did not have a job or a residence, but indicated to Ms. Moran that he was interested in buying an apartment in Nashville. Ms. Moran was interested in purchasing real estate as an investment, and the parties discussed the idea of forming a partnership to renovate and "flip" a property. The parties' discussions developed into a

concrete plan to locate and renovate a house and to share the profits of the sale. Specifically, the parties agreed that Ms. Moran would finance the project, and that Mr. Willensky would provide the labor to renovate the property. The profits of the sale were to be calculated based on a reimbursement to Ms. Moran for her entire investment, with any excess over costs being split between the parties. Although the parties did not reduce their agreement to writing, the existence of a partnership and the terms of their agreement are not disputed.

In June 2004, Ms. Moran purchased real property at 7014 Country Club Drive in Brentwood, Tennessee (the "Property"). Ms. Moran paid $240,000 for the Property, which was titled and financed in her name only. In order to facilitate the renovations, the parties agreed that Mr. Willensky would move into the Property. The original agreement between the parties called for renovations to be completed by December 2004, with a budget of $60,000. To accomplish this, Mr. Willensky was authorized to utilize both the bank account and the credit card that Ms. Moran had set up to fund the project.

During 2004, the parties communicated frequently regarding the progress and expenditures for the project. Ms. Moran had planned a trip outside the country toward the end of 2004. When the renovations on the project were not completed by that time, she became worried. Before leaving for her trip, Ms. Moran and Mr. Willensky agreed to modify the renovation plan to include additional construction. Mr. Willensky assured Ms. Moran that this additional construction as well as the originally planned renovations would be completed by February 2005, when she was scheduled to return from her trip. Ms. Moran secured additional funds to support the work prior to leaving the country.

When Ms. Moran returned to Tennessee in late January or early February of 2005, she discovered that the renovation work was not complete as Mr. Willensky had promised. In fact, Ms. Moran testified that the project was nowhere near completion and that Mr. Willensky had exhausted all of the funds she provided for the project, including the additional monies she had advanced prior to her trip. Mr. Willensky prevailed on Ms. Moran to continue with the project, which he again committed to complete—this time by the end of February 2005. From this point forward, Ms. Moran testified that it was difficult for her to get information from Mr. Willensky about expenditures. In order to get the project back on track, Ms. Moran asked Mr. Willensky to consult with Keith Bailey and Eve Utley, two acquaintances of Ms. Moran's who had successfully renovated houses in Nashville. Ms. Moran also asked Mr. Willensky to keep her apprised of the timing of completion and the actual and anticipated costs.

The record reveals that Mr. Willensky failed to take suggestions from either Mr. Bailey or Ms. Utley. Rather, Mr. Willensky continued to spend money on allegedly excessive, or unnecessary, items such as ornate tile work and ceilings, special-order carpeting, and a $320 ironing board. Although he had failed to meet the deadline(s) for completing the project, Mr. Willensky continued to assure Ms. Moran that the end was in sight and kept encouraging her to continue funding the project. By March of 2005, Ms. Moran told Mr. Willensky that she was running out of money, and that she was unwilling to secure more loans to complete the project. In response, Mr. Willensky promised to cover any losses, and asked Ms. Moran for permission to put the Property on the market in an unfinished state. Ms. Moran consented and the Property was listed for sale in April, May, and early June of 2005. Mr.

Willensky continued to live in the Property during this time, allegedly for the purpose of finishing the work. The Property did not sell.

On May 25, 2005, Mr. Willensky contacted Ms. Moran by e-mail to inform her that there was $2,500 left in the operating bank account, and that $3,000 was owed to the contractors. In response, Ms. Moran reminded Mr. Willensky that she had put some $40,000 into the account, which amount was supposed to pay for the mortgage and utilities for three months in order for the project to be completed. Moreover, Ms. Moran informed Mr. Willensky that she had put an additional $10,000 into the account. Specifically, Ms. Moran e-mailed: "when did you [Mr. Willensky] ever tell me about this? Why wasn't it part of the original budget? Where do you expect me to get this money? You really need to call me. You know that I called you and you didn't pick up."

Soon after the e-mail exchange, Ms. Moran informed Mr. Willensky that he would have to pay the full monthly costs of maintaining the Property as rent if he wished to continue living in the Property. In early June of 2005, Mr. Willensky made a payment of $2,000 to the project. This amount was equal to the cost of the first mortgage, which was less than half of the full monthly cost of maintaining the Property.

On or about June 16, 2005, Mr. Willensky called Ms. Moran to tell her that he had a family emergency that required him to go to Florida. However, Mr. Willensky assured Ms. Moran that he would return to Tennessee to continue work on the project as soon as possible. This information was reiterated in a letter from Mr. Willensky to Ms. Moran, which letter she received on June 16, along with some of the house keys. Mr. Willensky testified that he did not abandon the project, but that

Ms. Moran had fired him and told him to leave the Property. The trial court did not find Mr. Willensky's testimony on this issue to be credible. Specifically, the court stated in its order that: "Misleading Moran about his whereabouts, Willensky left the project and went to Florida to be with his ailing step-father on June 16, 2005. He told Moran that he would return to Tennessee and continue work on the house.... The proof does not support a finding that Moran fired Willensky. The proof does support a finding that Willensky left the project before it was finished."

When he left for Florida, there were outstanding bills on the project, totaling $6,169.75 which included $3,000 for the plumber, $550 for the drywall, $1,744.15 for carpeting, $360 to Waste Industries, $225 for garbage pickup, and $100 for water and sewer. Ms. Moran also had to pay $190.60 to replace the locks on the Property because Mr. Willensky did not relinquish all of the keys to her. After he left Tennessee, Mr. Willensky did not inform Ms. Moran of his whereabouts, although he continued to order work on the Property from a distance. However, Mr. Willensky failed to inform or consult with Ms. Moran concerning his actions. Ms. Moran discovered Ms. Willensky's actions when workers demanded payment and threatened lawsuits and liens. Ms. Moran was finally able to get in touch with Mr. Willensky to tell him to stop making financial commitments, expecting her to fund them. According to her Complaint, Ms. Moran also discovered, upon review of receipts and credit card charges, that Mr. Willensky had allegedly misappropriated funds, or had advanced himself monies that she had invested in the project. At this point, Ms. Moran took over the project in an attempt to complete the renovations and finally sell the Property. In so doing, Ms. Moran incurred additional expenses in excess of $30,000. Moreover, Ms. Moran has

paid all expenses associated with maintaining the Property since June 2005, including insurance, taxes, and utilities. Ms. Moran has neither sought, nor received, any contribution from Mr. Willensky for these costs. In fact, the record reveals that Mr. Willensky never provided Ms. Moran with bills, checks, or receipts showing any payments he made for the Property, nor did he ask to be reimbursed for money he allegedly spent. In total, Ms. Moran supplied substantially all of the monies for the renovation of the Property, which totaled $311,222.65 exclusive of the purchase price.

The record indicates that Mr. Willensky received Internal Revenue Service forms that Ms. Moran had prepared for the partnership, which forms showed monies he received from the partnership. Specifically, in February 2005, while he was still living in the Property, Mr. Willensky received a schedule K–1 for 2004. It appears that Mr. Willensky raised no objection to this tax form. In February 2006, Mr. Willensky received a second schedule K–1 for the tax year 2005, showing that he had received slightly less than $60,000 total from the partnership. The year 2005 schedule K–1 also included a letter stating that the information on the form had been reported to the Internal Revenue Service. Mr. Willensky gave both of these forms to his accountant.

When Mr. Willensky left Tennessee for Florida, he left items bought for the Property in a storage unit, which was rented in his name alone and for which he held the only key. In fact, the record reveals that Ms. Moran did not know the location or the contents of the storage unit. The trial court found that Mr. Willensky improperly charged Ms. Moran $575.88 for the cost of the storage unit.

Ms. Moran incurred additional expenses in winding up the partnership related to this litigation. Specifically, Ms. Moran provided proof at trial that she had incurred $38,983.70 in attorney's fees, as well as $637.50 in mediation fees, $1,657.75 in litigation expenses, and $3,385.00 in accountant fees. Amy Thompson, with Kraft CPAs (the accounting firm Ms. Moran hired), testified at trial concerning the financial records from the project. At trial, Mr. Willensky produced two separate sets of numbers, purporting to represent the amounts that he had spent on the project. However, neither set of numbers was shown to Ms. Moran prior to the lawsuit, and the second set of numbers was not produced during discovery. Moreover, Mr. Willensky previously testified in his deposition that he was reimbursed for all amounts he claimed to have spent on the project. The trial court specifically found that: "Willensky's claims of damages were inconsistent and not supported by a preponderance of the evidence." In fact, Mr. Willensky did not assert any right to the Property, or claims for reimbursement, until almost two years after this litigation was commenced.

On October 31, 2006, Ms. Moran filed suit against Mr. Willensky in the Chancery Court for Williamson County. In her Complaint, Ms. Moran alleged that Mr. Willensky had breached his fiduciary duty, and that he was guilty of fraudulent misrepresentation. Ms. Moran asked the court for a declaratory judgment, under Tenn.Code Ann. § 29–14–101 *et seq.*, declaring that Mr. Willensky had wrongfully dissociated from the partnership, that the partnership be dissolved, and that she receive expenses necessary for winding up the partnership, including actual damages, attorney's fees, and expenses.

On January 18, 2007, Mr. Willensky filed his answer, denying the material allegations set out in the Complaint. On January 2, 2008, Ms. Moran filed a motion for partial summary judgment. Specifically,

Ms. Moran moved the court for summary judgment on her declaratory judgment action, and upon her claim for breach of fiduciary duty based upon Mr. Willensky's alleged failure to cure the deficit in his capital account in the partnership. The motion was heard on May 12, 2008. By Order of May 15, 2008, the trial court granted Ms. Moran's motion in part, and denied it in part. Specifically, the court denied her request for winding up fees associated with the partnership, finding that there were material facts in dispute concerning said fees. The court awarded Ms. Moran $2,353.86 in late fees and finance charges associated with Mr. Willensky's mismanagement of the project, and $11,000 for monies paid to Mr. Willensky in 2004. In addition, Ms. Moran was awarded $1,697.86 for hotel bills Mr. Willensky had paid with project funds.

On June 13, 2008, Mr. Willensky filed a counter-complaint against Ms. Moran, alleging, *inter alia*, that Ms. Moran had breached the partnership agreement. Specifically, Mr. Willensky sought damages for, among other things, breach of contract, breach of fiduciary duty, conversion, or alternatively for partition of the Property. Ms. Moran answered the counter-complaint on July 15, 2008, denying the material allegations contained therein. On July 28, 2008, Mr. Willensky filed an abstract and notice of Lien *Lis Pendens.*

All pending matters were heard by the court on April 1, 2009. By Order of May 21, 2009, the court found that the parties had entered into a partnership, whereby they would share in the profits from the Property after Ms. Moran was reimbursed for her costs, including the purchase price. The court found that Mr. Willensky's conduct, both before and after leaving for Florida, constituted a breach of the express provisions of the partnership agreement in that he failed to provide the day-to-day labor, which ultimately resulted in a wrongful dissociation pursuant to Tenn. Code Ann. §§ 61–1–602(b)(1) and 61–1–801(2). The court went on to find that Mr. Willensky's negative capital account balance was a debt owed to the partnership, and that Ms. Moran, as the winding up partner, was entitled to remuneration for reasonable expenditures rendered in that process, including attorney's fees. Specifically, the court held that Ms. Moran was entitled to the following:

**Project Costs:**

| | |
|---|---|
| Storage unit cost: | $ 575.88 |
| Plumber promised and didn't pay: | $ 3,000.00 |
| Drywall promised and didn't pay: | $ 550.00 |
| Carpet ordered and didn't pay/ told not to order: | $ 1,744.15 |
| Waste Industries promised and didn't pay: | $ 360.00 |
| Garbage pickup past due: | $ 225.00 |
| Water & sewer past due: | $ 100.00 |
| Replacing locks on house: | $ 190.60 |

**Winding Up Costs:**

| | |
|---|---|
| Attorney's fees: | $38,983.70 |
| Tracey Shaw Mediation: | $ 637.50 |
| Litigation expenses (court reporter, filing fees) | $ 1,657.75 |
| Accountant fees: | $ 3,385.00 |

| | |
|---|---|
| **TOTAL:** | **$51,409.58** |

Concerning Ms. Moran's claim for fraudulent misrepresentation and punitive damages arising therefrom, the court found that the evidence did not clearly and convincingly support such a finding, and that Ms. Moran was not entitled to punitive damages. The court denied Mr. Willensky's counter-claim, finding that his claim for damages was inconsistent and not supported by a preponderance of the evidence. These findings were reduced to judgment in favor of Ms. Moran in the total amount of $66,980.58, which judgment also incorporated the $15,571 that was awarded to Ms. Moran on May 29, 2009 on her motion for partial summary judgment. The court also ordered that any liens that Mr. Wil-

lensky had against the Property be released.

Mr. Willensky appeals and raises nine issues for review as stated in his brief:

1. Were the provisions of the Tennessee Uniform Partnership Act properly applied?

2. Is there sufficient proof in the record that Willensky breached the partnership agreement?

3. Is there sufficient proof in the record to demonstrate a wrongful dissociation from the partnership by Willensky, or that Moran was entitled to wind up the partnership without selling the asset of the partnership?

4. Is Willensky entitled to a judicial winding up and accounting of the partnership?

5. Whether or not Moran's claim for dissociation of Willensky is proper, have the requirements of Part 8 of the Uniform Partnership Act been met?

6. Is Moran entitled to any damages under Tenn.Code Ann. § 61-1-401(h)?

7. Does the proof at trial support Moran's claim for an award of "project costs"?

8. Does the proof at trial support Moran's claim for an award of legal fees?

9. Does the proof at trial support Moran's claim for other litigation costs?

■ In the posture of Appellee, Ms. Moran also asks this Court to award her attorney's fees and costs accrued in defending this appeal. Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court.

Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R.App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn.Workers Comp.Panel 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). The weight, faith, and credit to be given to any witness' testimony lies, in the first instance, with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id.; see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

### *Applicability of the Tennessee Uniform Partnership Act*

It is undisputed in the record that the parties' relationship constituted a partnership and, as such, the trial court correctly applied the Tennessee Uniform Partnership Act ("TUPA"), Tenn.Code Ann. § 61-1-101 *et seq.*[1] Although, in his appellate brief, Mr. Willensky concedes that the TUPA is applicable in this case, he asserts that the factual findings of the trial court are not consistent with the preponderance of the evidence, and that the conclusions of law drawn by the trial court are inconsistent with the TUPA.

### *Breach of the Partnership Agreement*

■ It is undisputed that the parties' agreement was that they would share in

---

1. Specifically, Tenn.Code Ann. § 61-1-101(6) defines a partnership as "an association of two or more persons to carry on as co-owners of ... [a]n undertaking for profit;" Tenn.Code Ann. § 61-2-202(1)(a) states that "the association of two (2) or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership." Moreover, Tenn.Code Ann. § 61-2-202(3) provides that "[a] person who receives a share of the profits of a business is presumed to be a partner in the business...."

the profits from the sale of the Property after Ms. Moran was reimbursed for her expenditures, including the purchase price. The trial court found that Mr. Willensky breached this agreement, thereby wrongfully dissociating himself from the partnership. Specifically, the court found that:

Willensky's conduct, both before and after leaving for Florida, is conduct that was a breach of an express provision of the partnership agreement. He failed to provide the day to day labor for the project.

Tenn.Code Ann. § 61–1–601 provides, in relevant part, that:

A partner is dissociated from a partnership upon the occurrence of any of the following events:

(1) The partnership's having notice of the partner's express will to withdraw as a partner or on a later date specified by the partner;

\*   \*   \*

(5) On application by the partnership or another partner, the partner's expulsion by judicial determination because:

(A) The partner engaged in wrongful conduct that adversely and materially affected the partnership business;

(B) The partner willfully or persistently committed a material breach of the partnership agreement or of a duty owed to the partnership or the other partners under § 61–1–404; or

(C) The partner engaged in conduct relating to the partnership business which

makes it not reasonably practicable to carry on the business in partnership with the partner;

Because a partner has the power to dissociate at any time, rightfully or wrongfully, Tenn Code Ann. § 61–1–602(1), his or her dissociation is wrongful only under certain circumstances as set out at Tenn. Code Ann. § 61–1–602(b).[2] In the instant case, the court found that Mr. Willensky's dissociation was wrongful because it was "in breach of an express provision of the partnership agreement." Tenn.Code Ann. § 61–1–602(b)(1).

■ The undisputed proof indicates that Mr. Willensky left the project before it was completed. When Mr. Willensky left for Florida, there were outstanding bills on the project in the amount of $6,169.75. Until he left the state, it was Mr. Willensky who managed the payments for the project; consequently, the fact that he abandoned that responsibility supports a finding that he dissociated from the partnership. Perhaps more importantly, there is ample evidence that Mr. Willensky mismanaged the funds entrusted to him. The evidence indicates that Mr. Willensky often overspent on the project and, more egregiously, used project money for his own personal expenditures including rental on a storage unit and hotel bills. The proof also supports the trial court's finding that Mr. Willensky intentionally mislead Ms. Moran concerning his progress on the renovations and the completion date for

---

2.  Tenn.Code Ann. § 61–1–602(b) provides:

(b) A partner's dissociation is wrongful only if:

(1) It is in breach of an express provision of the partnership agreement; or

(2) In the case of a partnership for a definite term or particular undertaking, before the expiration of the term or the completion of the undertaking:

(A) The partner withdraws by express will, unless the withdrawal follows within ninety (90) days after another partner's dissocia-

tion by death or otherwise under § 61–1–601(6) through (10) or wrongful dissociation under this subsection;

(B) The partner is expelled by judicial determination under § 61–1–601(5);

(C) The partner is dissociated by becoming a debtor in bankruptcy; or

(D) In the case of a partner who is not an individual, trust other than a business trust, or estate, the partner is expelled or otherwise dissociated because it willfully dissolved or terminated.

the project. Inferentially, it appears that Mr. Willensky may have continued to assure Ms. Moran that the end was in sight as a means of encouraging her to continue with the project and to provide more funds. In fact, it was not until Ms. Moran insisted that Mr. Willensky pay rent to live in the Property that he suddenly left town. Despite these facts, Mr. Willensky insists that it was Ms. Moran who first breached the partnership agreement. Specifically, Mr. Willensky argues that he was "ejected" from the Property because of Ms. Moran's request that he pay rent to live there. At the time Ms. Moran asked for rent, the record indicates that she had spent or acquired debt of over $600,000 on the project. The original estimate for the project was $300,000, including the purchase price. Concerning Mr. Willensky's argument that Ms. Moran "ejected" him from the Property, thus breaching the partnership agreement, the record contains a letter from Mr. Willensky (in his own handwriting) to Ms. Moran, stating that he was leaving for personal reasons (i.e., his step-father's illness). We can only conclude from the facts that Mr. Willensky left the project on his own accord.

Although Ms. Moran acknowledges that she was very upset with the costs of the project, and that she told Mr. Willensky to stop making more financial commitments until the parties could sort out where the project stood, we cannot agree with Mr. Willensky that Ms. Moran's actions constitute a breach of the partnership agreement. Based upon Mr. Willensky's numerous promises that the project would soon be completed, and his expenditures that greatly exceeded the original budget, Ms. Moran's requests were entirely reasonable and, in fact, necessary. Consequently, we conclude that her actions did not constitute a breach of the partnership agreement.

Having found that the preponderance of the evidence supports the trial court's finding that Mr. Willensky breached the partnership agreement and wrongfully dissociated from the partnership, we now turn to the question of whether Ms. Moran was entitled to wind up the partnership.

### Winding Up

We first address Mr. Willensky's argument that, rather than awarding Ms. Moran damages based upon his wrongful dissociation, the trial court should have appointed a receiver to order an accounting and ultimate sale of the Property. In support of this argument, Mr. Willensky relies upon the case of *Norris v. Stuart,* No. M2004–01839–COA–R3–CV, 2006 WL 721299 (Tenn.Ct.App. March 20, 2006). We find Mr. Willensky's reliance upon the *Norris* to be misplaced. In *Norris,* one of the partners died. Consequently, there was dissociation for good cause, thus giving the surviving partner the right to participate in the winding up, to wit:

> As an automatic consequence of the death of Norris, the partnership was dissolved on June 3, 2000. The dissolution triggered the next phase, the winding up of the business of the partnership. Because Stuart had not wrongfully dissociated from the partnership, he was entitled to wind up the business of the partnership pursuant to Tenn.Code Ann. § 61–1–136 . . .

*Norris v. Stuart,* 2006 WL 721299, at *4.

Unlike the *Norris* case, here the trial court correctly found that Mr. Willensky had wrongfully dissociated from the partnership. When one partner wrongfully dissociates from the partnership, that partner usually loses the right to participate in the winding up of the partnership, except upon a showing of good cause for an order of judicial supervision of the winding up. Tenn.Code Ann. § 61–1–803.[3] Here, the

---

3. Tenn.Code Ann. § 61–1–803(a) provides      that:

trial court declined to make such a ruling, finding that the solution of partition "would only add additional debt to this partnership whose only asset is likely to render little, if any, profit due to the current real estate market." The evidence in the record does not preponderate against this finding.

As a result of Mr. Willensky's wrongful dissociation, Ms. Moran, as the sole remaining partner, had the right to wind up the partnership affairs. Specifically, Tenn. Code Ann. § 61–1–801 provides, in relevant part, as follows:

A partnership is dissolved, and its business must be wound up, only upon the occurrence of any of the following events:

\* \* \*

(5) On application by a partner, a judicial determination that:

(A) The economic purpose of the partnership is likely to be unreasonably frustrated;

(B) Another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner; or

(C) It is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement; or

In the instant case, Ms. Moran testified that, after Mr. Willensky's dissociation, she completed the renovation of the Property, and that she had paid all expenses associated with the Property since that time. Tenn.Code Ann. § 61–1–801(2) gives Ms. Moran the right to participate in the winding up of the partnership: "[a]fter

After dissolution, a partner who has not wrongfully dissociated may participate in winding up the partnership's business, but on application of any partner, partner's legal representative, or transferee, a court of

dissolution, a partner who has not wrongfully dissociated may participate in winding up the partnership's business." *Id.* As the winding up partner, Ms. Moran was not obligated to sell the Property; rather, Tenn.Code Ann. § 61–1–803 gives the winding up partner autonomy in choosing how to proceed in that endeavor:

A person winding up a partnership's business may preserve the partnership business or property as a going concern for a reasonable time ... settle and close the partnership's business, dispose of and transfer the partnership's property, discharge the partnership's liabilities, distribute the assets of the partnership pursuant to § 61–1–807, settle disputes by mediation or arbitration, and perform other necessary acts.

Tenn.Code Ann. § 61–1–803(c).

Moreover, Tenn.Code Ann. § 61–1–807 allows the winding up partner to reimburse himself or herself for monies that partner put into the partnership:

Each partner is entitled to a settlement of all partnership accounts upon winding up the partnership business. In settling accounts among the partners, the profits and losses that result from the liquidation of the partnership assets must be credited and charged to the partners' accounts. The partnership shall make a distribution to a partner in an amount equal to any excess of the credits over the charges in the partner's account. A partner shall contribute to the partnership an amount equal to any excess of the charges over the credits in the partner's account, but exclude from the calculation charges attributable to

equity jurisdiction in the county where the partnership's chief executive office is or was last located, for good cause shown, may order judicial supervision of the winding up.

an obligation for which the partner is not personally liable under § 61–1–306. Tenn.Code Ann. § 61–1–807(b).

At the creation of a partnership, each partner receives a capital account:

(a) Each partner is deemed to have an account, that is:

(1) Credited with an amount equal to the money plus the value of any other property, net of the amount of any liabilities, the partner contributes to the partnership and the partner's share of the partnership profits; and

(2) Charged with an amount equal to the money plus the value of any other property, net of the amount of any liabilities, distributed by the partnership to the partner and the partner's share of the partnership losses.

Tenn.Code Ann. § 61–1–401.

Depending upon the partnership assets, at the winding up of a partnership, each partner either has the right to the return of his or her positive capital account balance, or must pay his or her negative account balance:

(b) Each partner is entitled to an equal share of the partnership profits and is chargeable with a share of the partnership losses in proportion to the partner's share of the profits.

\* \* \*

(d) A partnership shall reimburse a partner for an advance to the partnership beyond the amount of capital the partner agreed to contribute.

Tenn.Code Ann. § 61–1–401(b) and (d).

In the case at bar, the balances of Mr. Willensky and Ms. Moran's respective capital accounts were reflected in the Internal Revenue Service K–1 forms that were issued for tax years 2004 and 2005, and received by Mr. Willensky in 2005 and 2006 respectively. As reflected on these forms, Mr. Willensky's negative capital account balance was a debt owed to the partnership. Tenn.Code Ann. § 61–1–807(b), *supra*. Moreover, Tenn.Code Ann. § 61–1–807(c) provides that:

(c) If a partner fails to contribute the full amount required under subsection (b), all of the other partners shall contribute, in the proportions in which those partners share partnership losses, the additional amount necessary to satisfy the partnership obligations for which they are personally liable under § 61–1–306. A partner or partner's legal representative may recover from the other partners any contributions the partner makes to the extent the amount contributed exceeds that partner's share of the partnership obligations for which the partner is personally liable under § 61–1–306.

In addition, the dissociated partner is liable to the partnership for any damages arising from an obligation incurred by the dissociated partner after dissociation, Tenn.Code Ann. § 61–1–702,[4] and a partner has the right to sue another partner in order to enforce the innocent partner's right to have the wrongfully dissociated partner's negative partnership account balance made up, and also has the right to continue the business after the wrongful dissociation, to wit:

(b) A partner may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to:

(1) Enforce the partner's rights under the partnership agreement;

---

4. The statute provides that:
(b) A dissociated partner is liable to the partnership for any damage caused to the partnership arising from an obligation incurred by the dissociated partner after dissociation for which the partnership is liable under subsection (a).

(2) Enforce the partner's rights under this chapter, including:

(A) The partner's rights under §§ 61–1–401, 61–1–403, or 61–1–404;

(B) The partner's right on dissociation to have the partner's interest in the partnership purchased pursuant to § 61–1–701 or enforce any other right under parts 6 or 7 of this chapter; or

(C) The partner's right to compel a dissolution and winding up of the partnership business under § 61–1–801 or enforce any other right under part 8 of this chapter; or

Tenn.Code Ann. § 61–1–405(b).

In this case, Mr. Willensky dissociated when he left Tennessee with the renovations incomplete, and did not return to complete the project. As the remaining partner, Ms. Moran properly finished the business of the partnership—renovation of the Property—without Mr. Willensky. Ms. Moran then initiated the winding up process, including litigation for judicial determination that Mr. Willensky wrongfully dissociated, and to recover damages brought about by Mr. Willensky's breach and his capital account deficiency. In so doing, Ms. Moran was well within her rights under the TUPA, as set out in detail above. In essence, the trial court's decision constituted a judicially supervised dissolution. Both parties made claim to the sole partnership asset—the Property. Both parties were allowed the opportunity to present evidence regarding the other partner's conduct related to the respective relief they sought. From the totality of the circumstances, we conclude that the trial court correctly applied the TUPA, and that Ms. Moran's actions concerning the winding up were within the statutory scheme.

### Winding up Expenses

■ As the winding up partner, Ms. Moran was entitled to recover costs associated with the winding up process: "[a] partner is not entitled to remuneration for services performed for the partnership, **except for reasonable compensation for services rendered in winding up the business of the partnership.**" Tenn.Code Ann. § 61–1–401(h) (emphasis added). Because Mr. Willensky's capital account had a negative balance, Ms. Moran was well within her rights to sue him to make up that balance. Tenn.Code Ann. § 61–1–405(b), *supra*. As part of this process, Ms. Moran incurred attorney's fees and expenses. It is well settled in Tennessee that an award of attorney's fees is authorized for a partner winding up the partnership. *See, e.g., Gates v. Levatino,* 962 S.W.2d 21, 27 (Tenn.Ct.App.1997), perm. app. denied (Tenn. Dec. 1, 1997); *Evans v. Boggs,* 35 Tenn.App. 354, 245 S.W.2d 641 (1951); *Bird v. Collette,* 26 Tenn.App. 181, 168 S.W.2d 797 (1942). Consequently, Mr. Willensky's reliance on the case of *Cracker Barrel Old Country Store, Inc. v. Epperson,* 284 S.W.3d 303 (Tenn.2009) for the proposition that attorney's fees are disallowed expenses is misplaced. *Cracker Barrel* is not a partnership case, but instead involves adjoining landowners in a dispute over restrictive covenants and an easement contained in a written agreement. *Cracker Barrel* is, in fact, a contract case and the dispositive issue before the court was whether to infer a right of recovery of attorney's fees based upon the contractual language used by the parties.

■ In the instant case, not only is there a statutory scheme allowing for recovery of attorney's fees, Tenn.Code Ann. § 61–1–401(h), but *Bird v. Collette* and its progeny have consistently interpreted winding up expenses to include attorney's fees. *See, e.g., Marengo v. Bowen,* No. M2000–02379–COA–R3–CV, 2001 WL 1565781 (Tenn.Ct.App. Dec. 10, 2001). Consequently, we conclude that the trial

court properly applied the TUPA in allowing Ms. Moran to recover attorney's fees in this case. The question, then, is whether the amount of the attorney's fees awarded was supported by a preponderance of the evidence.

The amount of attorney's fees awarded in this case was $38,983.70. Concerning the question of reasonableness of attorney's fees, Tenn. S.Ct. R. 8, RPC 1.5. provides the following guidelines:

(B) A fee is clearly excessive when, after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee.

Factors to be considered as guides in determining the reasonableness of a fee including the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

As a licensed attorney, Ms. Moran testified as to the hourly rate she was charged on this case. In her professional capacity, she opined that the fees charged were reasonable. While the trial court correctly declined to compensate Ms. Moran for her personal time in performing paralegal and accounting work (for which Ms. Moran claimed $10,925.00), Tenn.Code Ann. § 61–1–401(h), under the statutory scheme, she was entitled to recover expenses paid to other attorneys. Although Ms. Moran did not submit an itemization and supporting affidavit outlining the attorney's fees she paid, it was not mandatory that she do so. A trial court may fix the fees of lawyers with or without expert testimony of lawyers and with or without a *prima facie* showing by plaintiffs of what a reasonable fee would be. *Wilson Mgmt. Co. v. Star Distrib. Co.*, 745 S.W.2d 870, 873 (Tenn.1988). The trial judge may feel that the proceedings have sufficiently acquainted him or her with the appropriate factors to make a proper award of an attorney's fee without proof or opinions of other lawyers. *Kahn v. Kahn*, 756 S.W.2d 685, 696–97 (Tenn.1988). Therefore, reversal of a fee award is not required merely because the record does not contain proof establishing the reasonableness of the fee. *Kline v. Eyrich*, 69 S.W.3d 197, 210 (Tenn.2002). Should a dispute arise as to the reasonableness of the fee awarded, then in the absence of any proof on the issue of reasonableness, it is incumbent upon the party challenging the fee to pursue the correction of that error in the trial court by insisting upon a hearing on that issue, or to convince the appellate courts that he was denied the opportunity to do so through no fault of his own. *Id.* (citing *Wilson Mgmt. Co.*, 745 S.W.2d at 873); *Kahn*, 756 S.W.2d at 697. Absent a request for a hearing by the party dissatisfied by the award, a trial court is not required to entertain proof as to the reasonableness of the amount of attorney's fees awarded. *Richards v. Richards*, No. M2003–02449–COA–R3–CV, 2005 WL 396373, at *15 (Tenn.Ct.App. Feb. 17, 2005). In the instant case, there is no indication that Mr. Willensky objected to the lack of an affidavit or itemization sup-

porting the award of attorney's fees in this case until the appeal. There is also no indication that Mr. Willensky attempted to submit any evidence to dispute Ms. Moran's claim for attorney's fees and expenses. Moreover, Court of Appeals Rule 6 requires the Appellant to cite to the record in order to show where the alleged error was "seasonably called to the attention of the trial judge." Mr. Willensky fails to cite in his brief where in the record he objected to the lack of an affidavit or itemization. Tenn. Ct.App. R. 6. Because it is incumbent upon a party to take whatever action is reasonably available to prevent or nullify the harmful effects of an error, Tenn. R.App. P. 36(a), having not specifically raised this issue at the trial level, Mr. Willensky cannot be heard to complain on appeal. That being said, in reviewing the record, it appears that, at the time of the hearing, this case had been in litigation for nearly three years, including motions for summary judgment and discovery. Moreover, the parties had attempted mediation. It is undisputed that Ms. Moran bore the costs of the litigation. From our review, the evidence does not preponderate against the amount of attorney's fees awarded by the trial court.

Concerning the accountant's fees of $3,385.00, this amount was supported by the testimony of Amy Thompson, with Kraft CPAs, whom the court accepted as an accounting expert. Ms. Thompson provided invoices for her services, and testified as to the work performed, her hourly rate, and her credentials. This testimony supports the trial court's award of accountant's fees in this case. Concerning other litigation related expenses, including mediator's fees and transcript costs, receipts for these expenditures were submitted into evidence. From the record as a whole, we conclude that there is sufficient evidence to support the amount of fees awarded.

## Project Costs

The trial court awarded Ms. Moran $6,745.63 in project costs. In addition, Ms. Moran was awarded $15,051.72 (for inappropriate expenditures Mr. Willensky made with partnership funds) on her motion for partial summary judgment. From his brief, it does not appear that Mr. Willensky challenges the $15,051.72 award; rather he asserts that the $6,745.63 award for "project costs" was not supported by the proof. We disagree. Turning to the record, Ms. Moran itemized the project costs, and provided documentation for each expenditure as well as an explanation as to why she believed these expenses were recoverable. While Ms. Moran sought $8,928.16 in project costs, based upon the evidence, the trial court awarded only $6,745.63 of this amount. Regarding these project costs, Ms. Moran provided documentation of the $3,000 plumber's bill and the $550 drywall charges. In fact, according to the record, both the plumber and the drywaller were hired by Mr. Willensky and were left unpaid when he abandoned the project. The trial court properly found that these were financial commitments that Mr. Willensky should also bear. In addition, the proof reveals that Mr. Willensky also spent $1,744.15 for custom carpeting, despite the fact that Ms. Moran had specifically asked him not to make this purchase. The record indicates that Mr. Willensky ordered the carpet anyway, and left town without paying the bill. Consequently, the trial court correctly held that this, too, was an expense that Mr. Willensky should pay. In addition, Mr. Willensky left three other unpaid bills for services incurred on the project—$360 for Waste Industries, $225 for garbage pickup, and $100 for water and sewer. From the record, we conclude that the trial court did not err in charging these expenses to Mr. Willensky. Finally, concerning the award of $190 for new locks, the record indicates that Mr. Willensky left town without relin-

quishing all of the keys to the Property to Ms. Moran; consequently, and as a direct result of Mr. Willensky's actions, Ms. Moran was forced to incur these fees in order to gain access to the Property. All of these damages are supported by evidence in the record, including testimony, accountant verified reports, and other documentation.

### Attorney's Fees on Appeal

Ms. Moran has asked this Court to award her attorney's fees incurred in defending this appeal. An award of appellate attorney's fees is a matter within this Court's sound discretion. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn.Ct.App. 1995). In considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case. *Darvarmanesh v. Gharacholou*, No. M2004–00262–COA–R3–CV, 2005 WL 1684050, at *16 (Tenn.Ct. App. July 19, 2005). Considering all of the relevant factors in this case, we respectfully decline to exercise our discretion to award Ms. Moran's attorney's fees in this appeal.

For the foregoing reasons, we affirm the order of the trial court. Costs of this appeal are assessed against the Appellant, Elliot Willensky, and his surety.