IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 3, 2017 Session

## UNA P. IRVIN v. ERNEST J. IRVIN, II

**Appeal from the Circuit Court for Montgomery County**
**No. MCCCCVDV09-0084      Jill Bartee Ayers, Judge**

_____

### No. M2016-02540-COA-R3-CV

_____

Father filed a petition for modification of a permanent parenting plan seeking designation as the primary residential parent of the parties' two children. Mother filed a counter-petition for modification of the residential parenting schedule in the permanent parenting plan. After a hearing, the trial court denied Father's petition and granted Mother's petition, reducing Father's parenting time by twenty-four days. Father appealed. Because the trial court did not conduct an appropriate best interest analysis, we vacate the trial court's judgment and remand for further proceedings as necessary.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and KENNY W. ARMSTRONG, JJ., joined.

Donald N. Capparella and Elizabeth Noel Sitgreaves, Nashville, Tennessee, for the appellant, Ernest J. Irvin, II.

Sharon T. Massey, Clarksville, Tennessee, for the appellee, Una P. Irvin.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Una P. Irvin ("Mother") and Ernest J. Irvin, II, ("Father") are the parents of two children, Heidi Irvin (born September 2001) and Andrew Irvin (born November 2003). The parties were divorced by order of the court on May 27, 2010. In the final decree, the trial court awarded Mother a divorce on the ground of inappropriate marital conduct, designated her as the primary residential parent, and incorporated her proposed parenting plan. Father appealed asserting that the trial court committed a number of errors

including designation of Mother as the primary residential parent. After finding there was not a final judgment in the matter, we dismissed the appeal and remanded the case for resolution of several issues. *See Irvin v. Irvin*, No. M2010-01962-COA-R3-CV, 2011 WL 2436507, at *8-13 (Tenn. Ct. App. June 15, 2011).

Following a post-remand hearing, the trial court entered a final decree on October 31, 2011. In the final decree, the trial court declared the parties divorced rather than awarding a divorce to either party and corrected the ambiguities identified during the first appeal. The trial court designated Mother as the primary residential parent and incorporated the parenting plan from the original final decree. Thereafter, Father initiated a second appeal. *See Irvin v. Irvin*, No. M2011-02424-COA-R3-CV, 2012 WL 5993756 (Tenn. Ct. App. Nov. 30, 2013).

During the second appeal, Father argued that the trial court erred in designating Mother as the primary residential parent because the evidence preponderated "against the trial court's finding that [Mother] would be more likely to foster a close relationship between the children and him." *Id.* at *14. Specifically, Father argued that the evidence showed that Mother attempted to hinder his relationship with the two children. *Id.* at *15. We agreed, finding that Mother's actions constituted "egregious, unwarranted interference with the children's relationship with their father." *Id.* at *16. We based this finding on two incidents. First, following the trial court's denial of Mother's request for exclusive possession of the marital residence, Mother's father filed a Congressional Inquiry against Father based on Mother's alleged concerns that Father was abusive towards her and/or the children. *Id.* at *15. The filing of the Congressional Inquiry resulted in Father's removal from the marital residence for seventy-two hours. *Id.* Second, in 2010 after the trial court awarded Father alternate residential parenting time during the summer, Mother went to the general sessions court and obtained an ex parte protective order against Father based on her allegations that he "had choked the parties' son and had sexually abused their daughter." *Id.* The record, however, contained no evidence to support Mother's allegations. *Id.*

Despite finding that Mother interfered with Father's relationship with the two minor children, we affirmed the trial court's designation of Mother as the primary residential parent after finding other factors in favor of Mother, including that "the children were in a stable, satisfactory environment with [Mother]." *Id.* at *17. We noted that Mother's interference had abated, and she testified that "she was making an effort to improve her relationship with [Father] for the benefit of the children." *Id.*

Our ruling in Father's second appeal left the parenting plan in effect. In addition to designating Mother as the primary residential parent, the parenting plan provided Father with 114 days of parenting time per year. When the trial court adopted the parenting plan, Mother resided in Clarksville, Tennessee and Father resided in Ft. Rucker, Alabama. As a result, the parenting plan provided the majority of Father's

parenting time during the children's summer vacation, except for one week after school ended and one week before school began. The parenting plan also provided Father with parenting time during: (1) all three-day holiday weekends during the school year, (2) fall and spring vacation every odd-numbered year, (3) one period of winter vacation, (4) Father's Day and his birthday, and (5) either weekend before or after the children's birthdays. The parenting plan further provided Father the right to exercise parenting time one weekend per month in Clarksville. As for transportation, except for the one weekend per month that Father exercised parenting time in Clarksville, the parenting plan required that the parties meet halfway at an agreed-upon location to exchange the children.

Father is in the military and has relocated multiple times during the years following the trial court's initial adoption of the parenting plan. He currently resides in Tampa, Florida. Despite Father's relocations, the parties continued operating under the above parenting schedule.

On August 5, 2015, Father filed a petition to modify the parenting plan, requesting a change in the designation of the primary residential parent. He asserted that a material change of circumstance had occurred and that it was in the children's best interest that the trial court designate him as the primary residential parent. Most of the allegations in Father's petition related to Mother's parental interference and alienation, which Father noted were consistent with her past behavior. Father's allegations against Mother included the following: frequently attempting to bring the children back to Clarksville during Father's parenting time, denying Father multiple visits with the children, interfering with Father's phone calls and other communications with the children, and encouraging the children to call their stepfather "Dad." Father also alleged that Heidi missed school twenty-six times during the 2014-15 school year and that her grades were inconsistent and poor.

Mother filed an answer and counter-petition for modification of the parenting plan on August 25, 2015. Mother denied that she interfered with Father's parenting time and that she refused Father visitation, claiming that she adjusted the schedule to comply with the children's extracurricular activities. Mother further denied that Heidi had missed significant amounts of school or that she had poor grades. Mother sought to modify the parenting schedule, alleging that Father's relocation to Florida and the children's increased involvement in extracurricular activities constituted a material change in circumstance. Additionally, Mother requested that Father be responsible for all transportation costs when exchanging the children.

On July 12, 2016, while the children were visiting Father in Florida, Father filed a motion for a temporary restraining order and ex parte order seeking exclusive custody of the children. He alleged that Heidi told him that she feared her stepfather, Joe Smith ("Stepfather"). Father further alleged that Heidi could not relax in Mother's home because she felt constantly watched and monitored by Stepfather. According to Father,

Heidi had suicidal thoughts and had been sleeping with a hammer and knife under her bed because she did not feel safe in Mother's home.

Erin Poland, the guardian ad litem ("GAL") from the parties' divorce proceedings, also filed a motion for a temporary restraining order and ex parte order on July 15, 2016. In her motion, the GAL stated that Heidi mentioned a desire to seek counseling prior to Father's summer visitation. She further stated that Heidi had seen psychologist Dr. Janie Berryman twice and continued communication with Dr. Berryman while visiting Father in Florida. According to the GAL, Heidi reported feeling "not safe, not happy, and not comfortable" while living with Mother. The GAL explained that Heidi felt that Stepfather "constantly watches her making her feel monitored even during private times." The GAL recommended that the court extend Father's summer visitation until the scheduled hearing date of August 5, 2016. After Heidi agreed to an arrangement in which Stepfather found alternative housing, the GAL struck her motion; however, she renewed her motion on July 25, 2016.

Mother filed a response denying all allegations pertaining to Stepfather. She further denied that Heidi had been sleeping with a hammer and knife under her bed. Mother argued that Heidi made the statements about suicidal thoughts two or three years prior as a result of incidents with Father, not Stepfather. She further argued that Heidi had been punished and monitored due to her continued attempts to communicate with young men through social media.

On August 5, 2016, the trial court conducted a hearing on the motions filed by Father and the GAL. Heidi testified at the hearing. She was fourteen at the time of her testimony. With regard to why she felt uncomfortable around Stepfather, Heidi testified as follows:

> THE WITNESS: I always -- I feel like he has a really bad -- bad anger problem.
> THE COURT: Why?
> THE WITNESS: Because he always seems very, like, mad all the time. And I don't -- I don't know if that's just him being tired but he always seems like he's gonna yell at somebody, like, right then and there, so I don't want to do anything. So I'll go and I'll go sit in the kitchen and I'll study, or I'll read a book but that's pretty much it.
> THE COURT: Okay. Are there any other examples you can -- you want to share with me?
> THE WITNESS: There's nothing really else bad about him, I mean, that make me feel uncomfortable.
> THE COURT: Okay.
> THE WITNESS: I always feel like he's gonna hit -- like, hit me and -- 'cause -- just because he has that -- he gives off that feeling to me that he's

gonna hit me. He's gonna yell at me, and he's gonna call me names. And it's -- it's not a nice feeling.
THE COURT: Has he ever hit you?
THE WITNESS: No.
THE COURT: Has he ever called you names?
THE WITNESS: No. But he said I acted like some stuff.

Heidi further testified that there had been tension between her and Father in the past that had made her feel uncomfortable when visiting Father for the summer. Based on this testimony, the trial court denied both motions finding that "there have been no names called to her, no physical threats or violence against her, and she has admitted that for many years she had anxiety when she went to see her father for the summer." Thereafter, Stepfather moved back into Mother's home.

On October 4, 2016, the trial court heard the parties' modification petitions. The parties agreed to admit the transcript of Heidi's testimony from the August 5, 2016 hearing rather than require her to testify again. In addition to the testimony mentioned above, Heidi testified that she had felt uncomfortable around Stepfather for four years and, during those four years, she thought about suicide and felt depressed. She further testified that she attempted to commit suicide in sixth, seventh, and eighth grades; however, she stated that she had not attempted to commit suicide since starting high school. Heidi stated that she believed Stepfather was monitoring her phone because she would not receive notifications about new messages. Furthermore, when she checked her messages, they would be marked as viewed although she had not yet seen them. Heidi explained that she felt Stepfather often watched her because the red light on her phone would turn on indicating that the camera was in use. Heidi testified that Stepfather took her phone after discovering that she was communicating with young men through social media. She further testified that she believed the punishment "was understandable because that was one of the rules." According to Heidi, the allegations against Stepfather were unrelated to the phone restrictions imposed on her. Finally, she testified that she believed Father would protect her from anything but did not believe the same about Mother.

At trial, Father testified at length about Mother's interference with his relationship with the children. Father testified that, during his 2015 summer visitation with the children, Mother threatened to file a motion to return Heidi to Clarksville early for high school soccer tryouts. According to Father, it was unnecessary for Heidi to return to Clarksville early because the soccer coach told him that Heidi could try out after returning to Clarksville at the conclusion of his parenting time. Father testified that Mother does not provide him with information regarding the children's school or extracurricular activities. He admitted, however, that he could access this information through Facebook and the school's Power School program. Father also testified that he was not informed about a military appreciation night at one of Heidi's soccer games. He

only learned of the military appreciation night through Facebook and was able to attend the game, where he discovered that the sign-in sheet listed Stepfather as Heidi's escort. Father admitted that he was able to replace Stepfather as Heidi's escort during the event.

Father testified that Mother did not promote communication between him and the children because phone calls were "random at best." He stated that he purchased a separate phone for Heidi without informing Mother. Father explained that he did this "[b]ecause their phones have been taken from them in the past and I have gone without talking to them and, based on Heidi's fears, I wanted her to have a way to communicate with me or Ms. Poland, if she needed to."

Father also testified that he was concerned about the children's poor grades. According to Father, Andrew is an A student and Heidi "has the potential to be an A-B student." He stated that he reviews the children's grades through the Power School program every Monday and saw that they had C's and even a few F's.

At trial, Father's wife, Kerry Ann Irvin ("Stepmother"), testified that she had witnessed Mother's parental interference. Specifically, she detailed an incident that occurred in the summer of 2015 as the family was returning from a trip to the zoo. Andrew received a phone call from Mother, and Stepmother overheard Mother tell him that his football team lost because he was not there and his coach was upset with him as a result. Stepmother stated that Andrew was "very upset about that." Stepmother also testified that she heard Mother tell Father he had no business knowing about the children's schoolwork and no business contacting the school about their grades. Stepmother further testified that she overheard Mother tell Father that he had "absolutely no right to the children's medical records."

Mother also testified at trial. She admitted that she attempted to have Heidi returned early from summer visitation with Father for soccer tryouts in 2015. Mother denied that this was an attempt to interfere with Father's parenting time. She stated that she was unaware that the soccer coach would make any accommodations to allow Heidi to try out at the end of Father's parenting time. Mother denied interfering with Father's communications with the children. She testified that the children each had their own phones and often communicated with Father "every day, if not every other day, at some point." According to Mother, Father's complaints about a lack of communication with the children arose around 2013 or 2014. Mother testified that, during this time period, Father constantly lectured Heidi about her grades. He even went to Heidi's school and attempted to have her removed from the soccer team due to her poor grades. Mother testified that Father called Heidi a liar when she told him she was playing club soccer, not school soccer. As a result, Mother stated Heidi started pulling away from Father and not communicating with him. Mother testified that she encouraged Heidi to speak to Father during this time period.

Mother also testified about the children's grades. According to Mother, the grades posted online every Monday are not always accurate because "sometimes the grade just sits as it is because the teacher has not put the grades in" or because "the teacher puts in the wrong grade for the wrong student." She admitted that Heidi had a D and some C's at the time of trial, but she explained that Heidi missed some school due to a concussion. As a result, Heidi was working on completing make-up work for missed assignments. Finally, Mother testified that Heidi appeared to be "getting back to normal, back to herself, happy, comfortable."

Dr. Janie Berryman, a licensed psychologist, also testified at trial. Dr. Berryman testified that she initially treated Heidi during the parties' divorce from 2009 until 2011. In May 2016, Dr. Berryman received a call informing her that Heidi wanted to resume therapy. Dr. Berryman stated that she conducted an intake appointment with Heidi on May 17, 2016. According to Dr. Berryman, Heidi told her she had suicidal thoughts in seventh grade but nothing since then. Dr. Berryman testified that the current sessions focused on Heidi being in the home with Mother and Stepfather. Dr. Berryman further testified that Heidi was genuinely distressed about residing in Mother's home with Stepfather. She questioned the underlying cause of Heidi's distress, however. She stated that Heidi felt intimidated but did not "describe harsh circumstances of intimidation" and denied being hit or threatened. Dr. Berryman opined that the distress was created by a fear of "what might happen, not what has happened." Dr. Berryman testified that Heidi and Father had problems in the past, but Heidi told her that now she and Father had "bonded better than they ever had." In fact, Dr. Berryman testified that, when she met with Heidi three weeks before trial, Heidi told her that she wanted to live with Father.

The trial court entered its order on November 14, 2016. The trial court denied Father's petition for a change of primary residential parent, finding that he failed to prove by a preponderance of the evidence that a material change of circumstance had occurred warranting a change of custody. The trial court reasoned that the primary basis of Father's petition was Heidi's desire to live with Father and allegations against Mother and Stepfather, but the court found that the allegations were unsubstantiated and Heidi was "now ambivalent about where she wants to live."

The trial court next addressed Mother's petition to modify the parenting schedule. The court found a material change of circumstance had occurred because Father moved to Tampa, Florida and the children were more involved with sports and school. After finding that a material change of circumstance had occurred, the trial court conducted a best interest analysis under Tenn. Code Ann. § 36-6-106 and made findings of fact with respect to each factor. At the conclusion of its best interest analysis, the trial court stated that "[t]he best interest analysis weighs in favor of Mother continuing to be the primary residential parent with Father to have visitation." The trial court then adopted a new parenting plan that reduced Father's parenting time to 90 days and increased Mother's parenting time to 275 days. Notably absent from the best interest analysis was any

discussion of whether it would be in the children's best interest to reduce Father's parenting time by twenty-four days. The modified parenting plan requires Father to pay the entirety of the transportation costs incurred for exchanging the children.

Father appealed raising three issues: (1) whether the trial court abused its discretion in reducing Father's parenting time by twenty-four days, (2) whether the trial court erred in ordering Father to pay the entirety of the children's transportation costs, and (3) whether Father should be awarded his reasonable attorney's fees on appeal.

STANDARD OF REVIEW

Our review is de novo upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013). We review a trial court's conclusions of law de novo, according them no presumption of correctness. *Armbrister*, 414 S.W.3d at 692; *Rigsby v. Edmonds*, 395 S.W.3d 728, 734 (Tenn. Ct. App. 2012). A trial court's determinations of whether a material change in circumstance has occurred and where the best interests of the children lie are factual issues. *Armbrister*, 414 S.W.3d at 692; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Appellate courts must, therefore, presume a trial court's factual findings on these matters are correct and not overturn them unless the evidence preponderates to the contrary. *Armbrister*, 414 S.W.3d at 693.

Furthermore, as our Supreme Court has explained:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007).

*Id.* Trial courts have broad discretion to work out the details of parenting plans. *Id.* A trial court abuses its discretion when it "'appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.'" *Id.* (quoting *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)).

ANALYSIS

Once a trial court incorporates a permanent parenting plan into a final divorce decree, the parties must comply with it unless or until it is modified by a court. *Id.* at

697. Courts conduct a two-step analysis when assessing petitions for modification of the residential parenting schedule. *Williamson v. Lamm*, No. M2015-02006-COA-R3-CV, 2016 WL 5723953, at *3 (Tenn. Ct. App. Sept. 30, 2016). First, the court must determine whether a material change in circumstance has occurred since the court's adoption of the parenting plan currently in effect. Tenn. Code Ann. § 36-6-101(a)(2)(C); *Williamson*, 2016 WL 5723953, at *3. If the court finds that there has been a material change in circumstance, the court must then determine whether it is in the child's best interest to modify the parenting plan as requested. *Armbrister*, 414 S.W.3d at 705; *Williamson*, 2016 WL 5723953, at *3.

## I. Material Change in Circumstance

A material change in circumstance for purposes of modifying the residential parenting schedule is a "'distinct concept'" from a material change in circumstance for purposes of modifying custody. *Williamson*, 2016 WL 5723953, at *4 (quoting *Massey-Holt*, 255 S.W.3d at 607). A different statutory provision applies to each circumstance. *See* Tenn. Code Ann. §§ 36-6-101(a)(2)(B), -101(a)(2)(C). If the issue before the court is a modification of the residential parenting schedule, the threshold for determining whether there has been a material change of circumstance is "much lower" than the threshold for modification of the primary residential parent. *Williamson*, 2016 WL 5723953, at *4. "To modify a residential parenting schedule, 'merely showing that the existing arrangement [is] unworkable for the parties is sufficient to satisfy the material change of circumstance test.'" *Id.* (quoting *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 n.3 (Tenn. Ct. App. Aug. 18, 2006)).

In the present case, the trial court found that a material change of circumstance existed warranting a modification of the residential parenting schedule. The proof in the record does not preponderate against this finding. When the trial court adopted the current parenting plan, Father resided in Ft. Rucker, Alabama, which allowed the parties to meet at a location halfway between their residences to exchange the children. Father's move to Tampa, Florida requires the children to fly back and forth for each visit. Furthermore, the children are now in middle school and high school and are participating in more school and extracurricular activities. In light of the foregoing, there is sufficient proof to show that the current residential parenting plan is unworkable. The trial court, therefore, did not err in finding a material change in circumstance existed with regard to the residential parenting schedule.

## II. Best Interest

After finding that a material change in circumstance exists, a court must determine whether modifying the parenting plan is in the best interest of the child. Tenn. Code Ann. §§ 36-6-404(b), -405(a); *see also Williamson*, 2016 WL 5723953, at *5.

In the present case, the trial court conducted a best interest analysis applying the statutory best interest factors set forth in Tenn. Code Ann. § 36-6-106(a) and concluded: "The best interest analysis weighs in favor of Mother continuing to be the primary residential parent with Father to have visitation." As evidenced by this statement, the trial court conducted a best interest analysis determining whether it was in the best interest of the children to change the primary residential parent. However, the trial court had already determined that no material change in circumstance existed warranting a change in the primary residential parent. The issue before the court was whether it was in the best interest of the children to modify the *residential parenting schedule*. The trial court failed to make this determination. The trial court's failure to conduct this analysis means that the trial court did not make appropriate findings of fact with respect to this issue. *See Aragon v. Aragon*, No. M2013-01962-COA-R3-CV, 2014 WL 1607350, at *9 (Tenn. Ct. App. Apr. 21, 2014). With regard to a trial court's failure to make appropriate findings of fact and conclusions of law, the *Aragon* Court stated:

> This Court has previously held that a custody determination on behalf of a child is a "fact-intensive issue" that requires detailed findings of fact and conclusions of law by the trial court. *See Pandey v. Shrivastava,* No. W2012-00059-COA-R3-CV, 2013 WL 657799, at *5 (Tenn. Ct. App. Feb. 22, 2013) (concerning parental relocation) (citing TENN. R. CIV. P. 52.01 (requiring findings of fact and conclusions of law in bench trials)). In similar cases, this Court has vacated the judgment of the trial court where the court failed to make findings to support its rulings or where it failed to engage in a best interest analysis. *See, e.g., Iman v. Iman,* No. M2012-02388-COA-R3-CV, 2013 WL 7343928, at *13 (Tenn. Ct. App. Nov. 19, 2013) (vacating the judgment of the trial court when it failed to make appropriate findings of fact and failed to "make an explicit finding that modification was in the child's best interest"); *Pandey,* 2013 WL 657799, at *5–*6 (vacating based on the lack of findings); *Hardin v. Hardin,* No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *5 (Tenn.Ct.App. Dec. 27, 2012) (vacating based on the trial court's failure to make a finding that modification of the parenting plan was in the child's best interest).
>
> This Court has previously held that the General Assembly's decision to require findings of fact and conclusions of law is "not a mere technicality." *In re K.H.,* No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009). Instead, the requirement serves the important purpose of "facilitat[ing] appellate review and promot[ing] the just and speedy resolution of appeals." *Id.; White v. Moody,* 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004); *Bruce v. Bruce,* 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." *In*

*re K.H.,* 2009 WL 1362314, at *8 (quoting *In re M.E. W.,* No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. April 21, 2004)).

*Id*. By failing to determine whether modification of the residential parenting schedule was in the children's best interest, the trial court applied an incorrect legal standard to the issue then before the court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Consequently, we vacate the judgment of the trial court and remand for the court to consider all relevant factors and determine whether it is the children's best interest to modify the residential parenting schedule.

Because we are vacating the trial court's judgment for lack of an appropriate best interest analysis, Father's argument pertaining to the trial court ordering him to pay the entirety of the children's transportation costs is pretermitted.

### III. Attorney's Fees

Finally, Father requests that he be awarded his attorney's fees on appeal. Litigants are generally required to pay their own attorney's fees unless a statute or contract provision provides otherwise. *John Kohl & Co., P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998). In cases that involve issues pertaining to child custody and child support, a decision to award attorney's fees on appeal is within the discretion of the appellate court. Tenn. Code Ann. § 36-5-103(c); *In re Ava B.*, No. E2017-00440-COA-R3-JV, 2017 WL 6517589, at *9 (Tenn. Ct. App. Dec. 20, 2017). When an appellate court considers a request for appellate attorney fees, the court considers "the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other relevant equitable factors in a given case." *Moran v. Willensky*, 339 S.W.3d 651, 666 (Tenn. Ct. App. 2010). After considering all the relevant factors in this case, we decline to award Father his attorney's fees incurred on appeal.

### CONCLUSION

The judgment of the trial court is vacated, and this matter is remanded for the trial court to determine whether modifying the residential parenting schedule is in the best interest of the children. The costs of appeal are assessed equally against the parties: one-half against the appellant, Ernest J. Irvin, II, and one-half against the appellee, Una P. Irvin.

_____
ANDY D. BENNETT, JUDGE