IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 6, 2019 Session

**APRIL H. v. SCOTT H.**

**Appeal from the Chancery Court for Rutherford County**
**No. 17CV-281      Howard W. Wilson, Chancellor**

_____

**No. M2018-00759-COA-R3-CV**

_____

This is a divorce case. Wife filed for divorce in February 2017 after twelve years of marriage. Following a three-day trial, the trial court ordered Husband to pay $1000 in transitional alimony to Wife for six months and $500 per month for the following six months. The trial court also entered a permanent parenting plan for the parties' two minor children naming Husband primary residential parent. Husband received 233 days of parenting time, and Wife received 132 days. Wife appeals. Discerning no error, we affirm.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed and Remanded.**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Mitchell E. Shannon, Murfreesboro, Tennessee, for the appellant, April H.[1]

Heather G. Parker, Murfreesboro, Tennessee, for the appellee, Scott H.

**OPINION**

**I.      Background**

April H. ("Appellant" or "Wife") and Scott H. ("Appellee" or "Husband") were married on August 20, 2005. Two minor children, J.H. (age 11) and L.H (age 6), were born to the marriage. Wife has two children from previous relationships, K.S. (age 20)

_____

[1] Due to the sensitive nature of the facts we use the parties' last initial and the children's initials to protect their anonymity.

and D.S. (age 16). During the marriage, Wife worked small jobs (i.e., fast food), but she was primarily a stay-at-home mom. Husband works for TVA; his gross monthly income was approximately $9,332.12 at the time of trial. In 2011, Wife earned an online bachelor's degree in marketing. At the time of the hearing, Wife was 37 years old, and Husband was 41 years old.

Wife filed a complaint for divorce on February 23, 2017 alleging irreconcilable differences and inappropriate marital conduct. Prior to filing her complaint, Wife filed a petition for an order of protection alleging that Husband abused J.H. and D.S. The trial court entered an *ex parte* order of protection, which was subsequently consolidated with the divorce case. On March 8, 2017, Husband filed an answer to Wife's petition for order of protection denying any abuse. Husband also filed a proposed parenting plan, wherein he asked the court to grant equal parenting time to the parties. On March 10, 2017, Husband filed an answer and counter-complaint for divorce alleging irreconcilable differences and inappropriate marital conduct. The *pendente lite* matters were heard by a special master, who dismissed the order of protection and granted a temporary parenting schedule giving each parent equal parenting time according to Husband's proposed parenting plan. The parties settled the division of marital property in mediation but were unable to agree on a parenting plan and alimony.

According to Wife, one of the major problems in the marriage was the way Husband treated her son D.S. D.S. exhibited severe behavioral issues throughout the parties' marriage and was removed from multiple schools for fighting. At times, D.S.'s behavior was so volatile that he was confined to his bedroom for his own safety and the safety of others in the home. D.S.'s behavior and the parties' attempts to manage his behavior strained the marital relationship. At one point, D.S. went to live with his grandmother in Michigan; however, this arrangement did not last. Wife then sent D.S. to live at Good Sheppard Children's Home.

The parties separated in April 2017, and Husband moved into an apartment near J.H. and L.H.'s school. In June 2017, following the parties' separation, D.S. returned to live with Wife in the marital home. On August 11, 2017, Husband filed an emergency motion for a restraining order to keep D.S. away from the two younger children. According to Wife, L.H. made an allegation that D.S. had done "something down there." There was a DCS investigation, and the matter was eventually heard by a special master, who held that there was no proof that D.S. had harmed the children. The emergency motion was dismissed, but the special master's ruling, which was later confirmed by the trial court's order of September 27, 2017, provided that D.S. was not to be left unsupervised with the minor children.

On November 1, 2, and December 21, 2017, the trial court heard all pending matters. On January 29, 2018, the trial court issued its memorandum and order. As is relevant to this appeal, the trial court named Husband primary residential parent for L.H.

and J.H. Under the permanent parenting plan, Husband received 233 days of parenting time, and Wife received 132 days. The trial court ordered Husband to pay transitional alimony in the amount of $1,000 per month for six months and $500 per month for the following six months. Wife filed a motion for new trial, which the trial court denied. She appeals.

## II. Issues

Wife presents the following issues on appeal:

1. Whether the trial court erred in its award of alimony to Appellant.

2. Whether the trial court abused its discretion in significantly reducing Appellant's parenting time.

In the posture of Appellee, Husband requests attorneys' fees on appeal.

## III. Standard of Review

This case was tried by the court sitting without a jury. As such, we review the trial court's findings of fact *de novo* on the record with the presumption that those findings are correct, "unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). We review the trial court's conclusions of law *de novo* with no presumption of correctness. ***Gonsewski v. Gonsewski***, 350 S.W.3d 99, 105-106 (Tenn. 2011); ***Hyneman v. Hyneman***, 152 S.W.3d 549, 553 (Tenn. Ct. App. 2003).

## IV. Analysis

### A. Alimony

Wife argues that the trial court erred in awarding her transitional alimony of $1,000 for six months and $500 for the following six months. She contends that the trial court should have awarded rehabilitative alimony of $1,000 per month for four years. Concerning its award of alimony, the trial court's order states in relevant part:

> [Wife] has both the ability and the education necessary to earn a steady living. Further, she has minimal debt, and no debt associated with her home. Considering her bona fide expenses of $1,477 per month, as well as the assets granted to her in the parties' division of property and the income and expenses of the Husband, the court finds that [Wife] should be entitled to transitional alimony for the purpose of assisting with her expenses as she obtains regular employment. Beginning on February 1, 2018, support shall be paid to [Wife] by [Husband] in the amount of $1,000 per month for a

period of six months, then reduced to $500.00 per month for an additional six months.

Tennessee recognizes four types of alimony: rehabilitative alimony, transitional alimony, alimony *in futuro*, and alimony *in solido*. Tenn. Code Ann. § 36-5-121(d)(1). Each type of alimony addresses a specific need. Alimony *in futuro* and alimony *in solido* are the two forms of "long term or more open-ended support." **Burlew v. Burlew**, 40 S.W.3d 465, 471 (Tenn. 2001) (citing **Waddey v. Waddey,** 6 S.W.3d 230, 232 (Tenn. 1999)). By contrast, rehabilitative alimony is short-term support that enables a disadvantaged spouse to acquire additional education or training so that the spouse can achieve a standard of living comparable to the standard of living that existed during the marriage or the post-divorce standard of living expected to be available to the other spouse. *See* Tenn. Code Ann. § 36-5-121(e)(1). *See also* **Robertson v. Robertson,** 76 S.W.3d 337, 340-41 (Tenn. 2002); **Riggs v. Riggs,** 250 S.W.3d 453, 456 n. 4 (Tenn. Ct. App. 2007). The purpose of rehabilitative alimony is to assist the disadvantaged spouse in becoming self-reliant following a divorce. **Gonsewski v. Gonsewski,** 350 S.W.3d 99, 108 (Tenn. 2011); **Robertson,** 76 S.W.3d at 340-41; **Isbell v. Isbell,** 816 S.W.2d 735, 738-39 (Tenn. 1991).

Where economic rehabilitation is unnecessary, transitional alimony may be awarded. In contrast to rehabilitative alimony, which is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance to adjust to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. **Gonsewski,** 350 S.W.3d at 109 (emphasis added). Transitional alimony assists the disadvantaged spouse with the transition to the status of a single person. **Mayfield v. Mayfield,** 395 S.W.3d 108, 115 (Tenn. 2012) (citations omitted); **Miller v. McFarland**, No. M2013-00381-COA-R3-CV, 2014 WL 2194382, at *2 (Tenn. Ct. App. May 23, 2014).

"[T]rial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award." **Mayfield,** 395 S.W.3d at 114 (citations omitted). As a result, "[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence. . . ." **Kinard v. Kinard**, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998). Instead, "[t]he role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable." **Broadbent v. Broadbent**, 211 S.W.3d 216, 220 (Tenn. 2006). In other words, appellate courts decline to second-guess a trial court's spousal support decision absent an abuse of discretion. **Robertson**, 76 S.W.3d at 343. An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an

- 4 -

injustice. ***Wright ex rel. Wright v. Wright***, 337 S.W.3d 166, 176 (Tenn. 2011); ***Henderson v. SAIA, Inc.***, 318 S.W.3d 328, 335 (Tenn. 2010). The abuse of discretion standard does not permit an appellate court to substitute its judgment for that of the trial court, but "reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives, and thus envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." ***Henderson***, 318 S.W.3d at 335 (quoting ***Lee Medical, Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010)). Consequently, when reviewing a discretionary decision by the trial court, such as an alimony determination, the appellate court should presume that the decision is correct and should review the evidence in the light most favorable to the decision. ***Gonsewski***, 350 S.W.3d at 105-06; ***Loewen v. Loewen***, No. M2014-02501-COA-R3-CV, 2015 WL 6438753, at *2 (Tenn. Ct. App. Oct. 22, 2015).

The Legislature has outlined several factors for courts to consider in determining whether to award spousal support and, if so, the nature, amount, length, and manner of payment thereof, to wit:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121 (i). Although each of these factors must be considered when relevant to the parties' circumstances, "the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay." *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs*, 250 S.W.3d at 457).

In reaching its decision to award transitional alimony to Wife, the trial court considered all of the factors outlined in Tennessee Code Annotated section 36-5-121(i). As set out in its order, *supra*, the trial court discussed the parties' property settlement agreement, under which Wife received more assets than Husband. Specifically, Wife received: (1) the unencumbered marital home, with an approximate value of $160,000; (2) $60,000 from Husband's 401(k); (3) half of Husband's TVA pension worth approximately $48,000; (4) three savings accounts totaling over $8,800; and (5) two cars.

The trial court found that Wife has no mental or physical condition that prohibit her from working full time. Wife obtained a bachelor's degree in marketing during the marriage, and the trial court considered Wife's education in determining that she "has the ability to transition into a job that will provide her with a stream of income necessary to meet her monthly financial needs, which amount to $1,477.00 per month." Wife was advised by the special master in April 2017 that she should begin looking for employment. In awarding transitional alimony, the trial court reiterated that Wife will need to seek employment. Nonetheless, Wife maintains that she has no ability to earn sufficient income to cover her monthly expenses of $1,477 per month.[2] Wife has a bachelor's degree. She testified that after earning her degree, she obtained employment in the marketing field. Wife is able bodied and under the age of 40. Based on the division of marital property, she has minimal debt and no mortgage obligations. Although she will need to procure employment, the record shows that she is capable of doing so. As such, the trial court's award of transitional alimony is appropriate.

As discussed above, transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance to adjust to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. *Gonsewski*, 350 S.W.3d at 109. This is the scenario presented here. $1,000 in transitional alimony for six months tapering to $500 per month for six additional months will give Wife the time to find employment and the motivation to do so. As such, we conclude that the trial court did not abuse its discretion in the type, amount or duration of alimony.

## B. Parenting Time

---

[2] The parties do not appeal the trial court's finding that Wife's monthly expenses total $1,477.

Wife also appeals the trial court's allocation of parenting time for the parties' minor children. Decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors. *Holloway v. Bradley,* 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit,* 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997). Therefore, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988) (internal citations omitted). As the Tennessee Supreme Court has stated,

> [i]t is not the function of appellate courts to tweak a visitation order in the hopes of achieving a more reasonable result than the trial court. Appellate courts correct errors. When no error in the trial court's ruling is evident from the record, the trial court's ruling must stand. This maxim has special significance in cases reviewed under the abuse of discretion standard. The abuse of discretion standard recognizes that the trial court is in a better position than the appellate court to make certain judgments. The abuse of discretion standard does not require a trial court to render an ideal order, even in matters involving visitation, to withstand reversal. Reversal should not result simply because the appellate court found a "better" resolution. An abuse of discretion can be found only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.

*Eldridge v. Eldridge,* 42 S.W.3d 82, 88 (Tenn. 2001) (internal citations omitted); *see also Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013).

"[C]ustody and visitation arrangements are among the most important decisions confronting a trial court in a divorce case. The needs of the children are paramount; while the desires of the parents are secondary." *Gaskill v. Gaskill,* 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). As set out in Tennessee Code Annotated section 36-6-106(a), the child's best interest is the cardinal concern in setting a parenting plan.

> In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination *shall be made on the basis of the best interest of the child.* In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

***

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . ;

***

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

***

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106 (a) (emphasis added).

On appeal, Wife contends that the parenting schedule set by the trial court denies her "the maximum participation possible in the life of the child[ren]." Tenn. Code Ann. § 36-6-106 (a). The trial court awarded Husband 233 days of parenting time and Wife 132 days. Wife argues that the trial court should have equally divided the parenting time, which was the arrangement under the temporary parenting plan. As set out in its order, the trial court weighed the relevant statutory factors in determining the parenting schedule. Tenn. Code Ann. § 36-6-106(a), *supra*. The trial court determined that several of the factors did not weigh in favor of one party or the other. For example, the trial court found that "both parents love their children very much, and neither parent disputes this." Although Wife made allegations that Husband physically abused the two boys, the trial court determined that there was "no credible corroborating evidence to support such

abuse." The record supports this finding. Dr. Osborne, the children's counselor, testified that neither J.H. nor L.H. relayed any statements regarding abuse by Father. Furthermore, a cursory DCS investigation found Wife's allegations of abuse against Husband to be unfounded.

Regarding each parent's "past and potential for future performance of parenting responsibilities, including willingness and ability to facilitate and encourage a relationship between the children and the other parent," Tenn. Code Ann. § 36-6-106 (a)(2), the trial court found that this factor weighed in favor of Husband, to wit:

> The Special Master's ruling of September 8, 2017 (confirmed by the Court on September 27, 2017) provides that [Wife's] oldest child D.S., shall not be left alone unsupervised with the other children. The testimony shows that D.S. and J.H. continue to share a bedroom despite the order of this court. Although [Wife] claims that she did not understand the ruling and that the two boys merely sleep in the same bedroom and do not interact, the court finds that this explanation is not satisfactory. [Wife's] ongoing violation of the previous court order indicates that she may have trouble abiding by orders in the future. Further, the children's counselor, Dr. Osborne, testified that although there is evidence of parental alienation on the part of both parents, it is more clearly evident on the part of the [Wife].

With regard to meeting the emotional needs of the children, the trial court found that:

> [a]lthough both parents nurture the children's emotional needs, [Wife] refuses to participate in counseling with the children despite being invited and encouraged to do so. The court finds that her decision to forego the counseling sessions is inexplicable and hampers the full range of benefits that counseling can provide. Further, as disclosed to the counselor by the children, [Wife] places her children 'in the middle' between her and [Husband] by her actions amounting to parental alienation. Her inability to act as a co-parent is detrimental to the children's emotional well-being.

Dr. Osborne testified that Husband brought the children to therapy and although she was concerned about parental alienation, the children were doing well. According to Dr. Osborne, Wife only brought the children to see her on one occasion. Afterward, J.H. reported to Dr. Osborne that Wife told J.H. not to tell Husband that he had been to counseling. Dr. Osborne elaborated that both children described situations where they heard each parent talk negatively about the other parent. However, the children seemed more focused on the fact that Wife was interrogating them about their activities at Husband's house. Dr. Osborne's testimony supports the trial court's finding that Husband is more adept at meeting the emotional needs of the children.

The trial court also determined that Husband's "moral, physical, mental and emotional fitness" as it relates to his ability to parent the children is superior to that of Wife. She contends that the trial court is punishing her by reducing her time with the children for her "human frailties [and] past mis-steps." Her argument is indicative of the problems outlined by the trial court throughout its ruling. Wife ardently complains that she is being punished, but she never argues that spending more time with her is in the children's best interest. In fact, in her arguments to this Court, Wife spends very little time discussing the children or their needs.

The trial court found that the factor involving the character and behavior of persons who reside in or frequent the home of a parent and interact with the children must also favor Husband, and the record supports this finding. Of particular concern is Wife's ongoing relationship with her father, George Soles. Testimony reveals that Wife told Husband that Mr. Soles assaulted and sexually molested her and her siblings. Additionally, Wife's daughter, K.S., testified that Wife told her to "watch out" for Mr. Soles because he did inappropriate things with Wife and her siblings. Wife's deposition testimony revealed that during the pendency of the divorce, Wife left the children alone with Mr. Soles to "test him to see if he would do anything." Based on this evidence, the trial court correctly determined that Wife's decision was "incredibly inappropriate" and could have exposed the children to danger. Unfortunately, leaving the children alone with Mr. Soles was not Wife's only poor decision with regard to who she allowed to interact with the parties' children.

In addition to the issues with Mr. Soles, Wife reconnected with Jason Reed, K.S.'s biological father, in 2014. According to Husband, Wife admitted to him that K.S.'s birth was a product of rape. At the time K.S. was conceived, Wife was sixteen years old and Mr. Reed was twenty-seven years old. Assuming arguendo that Wife's relationship with Mr. Reed was consensual, it was still illegal.[3] Since 2017, Wife has seen Mr. Reed repeatedly including having him to dinner at the marital residence. K.S. testified that Wife has considered getting back together with Mr. Reed, and Wife did not deny her intentions of becoming more serious in her relationship with Mr. Reed once the divorce was finalized. Wife contends that "if the court believes the persons should not be around the children, the remedy would be to exclude them from contact rather than reducing Wife's time." Wife's suggestion might be persuasive; however, in view of the evidence that Wife ignored the prior order prohibiting unsupervised contact between D.S. and the two younger children, it is not likely that Wife will comply with other no contact mandates. From the totality of the circumstances, we conclude that the trial court did not err in fashioning the parenting schedule.

## C. Attorneys' Fees on Appeal

---

[3] *See* Tenn. Code Ann. § 39-13-506. There is no indication in the record that Mr. Reed was ever charged with a crime.

Both parties ask this Court to award their respective attorneys' fees and costs on appeal. Litigants must typically pay their own attorneys' fees absent a statute or agreement providing otherwise. *See **State v. Brown & Williamson Tobacco Corp.***, 18 S.W.3d 186, 194 (Tenn. 2000). However, an award of appellate attorney fees is a matter that is within this Court's sound discretion. ***Archer v. Archer***, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). In considering a request for attorney fees on appeal, we consider the ability of the party seeking the fee award to pay such fees, his or her success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case. ***Moran v. Wilensky***, 339 S.W.3d 651, 666 (Tenn. Ct. App. 2010)(citing ***Archer v. Archer***, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). Considering all of the relevant factors, we exercise our discretion to deny the parties' requests for attorneys' fees.

## V.     Conclusion

For the foregoing reasons, we affirm the trial court's order. The case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against Appellant, April H., for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE